McKNELLY and another, Appellants, vs. BROTHERHOOD OF AMERICAN YEOMEN, Respondent.

*March 25—April 13, 1915.*

*Trial: Setting aside verdict: Appeal: Life insurance: Mutual benefit certificate: Avoidance by misstatements in application: Evidence as to tuberculosis: Competency: Weight: Statutes: Effect on contract.*

1. The verdict of a jury is not to be set aside except in a case where there is no evidence in its support, or where the great weight of the evidence is against it and that weight is so reinforced by undoubted physical facts or by all the reasonable probabilities and inferences that it becomes overwhelming.
2. The decision of the trial court is not to be set aside on appeal unless it was clearly wrong.
3. The confidential report of a medical examiner of a mutual benefit society, accompanying an application for membership therein, is competent evidence as against the society in favor of the beneficiary under a certificate issued on such application and report; but statements of the applicant himself in such application are self-serving declarations and are not admissible as evidence in behalf of the beneficiary.
4. Although in this case, in the absence of any other evidence, such a report of the medical examiner might sustain an inference that the applicant did not then have tuberculosis, yet, since the facts stated therein might all be true and yet the tubercular condition have existed, it was not sufficient to sustain a verdict

to the effect that such condition did not then exist, as against unimpeached and certain affirmative evidence that it did in fact exist.

5. Statements in the application concerning the health of the insured having been expressly made warranties, and it having been provided in the benefit certificate that if untrue they rendered the contract void, that effect must be given to them unless otherwise provided by statute.

6. Ch. 507, Laws of 1911 (sec. 4202s, Stats. 1913), did not change the rights of the parties under an insurance contract made prior to the enactment of that statute.

7. An insurance contract not made in this state is not affected, so far as contract rights are concerned, by Wisconsin statutes.

8. Secs. 4200, 4201, Gen. Stats. Kansas, 1909 (relating to the effect of misrepresentations in obtaining a policy of insurance), apply only to life insurance companies and not to fraternal benefit societies.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed.*

This is an action to recover upon two benefit certificates of $1,000 each, issued at Wellington, Kansas, by the respondent, a mutual benefit association organized under the laws of Iowa, upon the lives of Theodore McKnelly and Ida P. McKnelly, respectively, in favor of each other. The McKnellys were husband and wife and the plaintiff *Otto* is their son. The certificates were both issued May 20, 1911. On the 24th of September, 1912, both of the insured persons were found murdered in a tent in the outskirts of the village of Wellington. *Otto* was arrested, charged with the murder, but was discharged on the preliminary examination. Three defenses were alleged: (1) that under the terms of the certificates no action could be maintained until a board of arbitration had been appointed and failed to settle the controversy, and that no such board had been appointed; (2) that the plaintiff *Otto* murdered his father and mother; (3) that the certificates were both void because obtained by false representations and warranties as to the health of Theodore McKnelly.

The first defense was overruled by the court, and the following special verdict was rendered by the jury:

"(1) Did the plaintiff kill his father and mother?   A. No.
"(2) Did the plaintiff's father have tuberculosis in May, 1911?   A. No.
"(3) If you answer question 2 'Yes,' did the plaintiff's mother, at and prior to the time she made application for insurance, know that her husband had tuberculosis?   (Unanswered.)"

Upon motion the trial judge changed the answer to the second question from "No" to "Yes" and dismissed the complaint on the merits, and the plaintiffs appeal.

*C. F. Lamb,* for the appellants.

*Charles E. Whelan* and *Rufus B. Smith,* for the respondent.

WINSLOW, C. J.   The first and most important question in the case is the question whether the court rightly changed the answer to the second question in the verdict of the jury. This question is to be considered in the light of two principles: (1) that the verdict of a jury is not to be set aside except in a case where there is no evidence in its support, or where the great weight of the evidence is against it and that weight is so reinforced by undoubted physical facts or by all the reasonable probabilities and inferences that it becomes overwhelming.   *Bannon v. Ins. Co. of N. A.* 115 Wis. 250, 91 N. W. 666; *Peat v. C., M. & St. P. R. Co.* 128 Wis. 86, 107 N. W. 355; (2) that the decision of the trial court is not to be set aside unless we are satisfied that the decision was clearly wrong.   *Slam v. L. S. T. & T. R. Co.* 152 Wis. 426, 140 N. W. 30.

In the present case the certificates were based upon written applications, copies of which were indorsed upon the certificates, and a provision inserted in the certificates to the effect that such statements, including the answers in the medical

examination, were made part of the agreement; that they were true in every particular and should be held to be strict warranties. The certificates also recited that they were issued in consideration of the conditions and warranties in the application, which "are also made a part of this contract." The medical examination questions were entitled "Warranties of Application" and contained a specific warranty of their truth, also a provision that they should be copied on the certificate and form a part of the contract; also the following: "I agree that any untrue answer to any question on this application blank or concealment, misrepresentation, or suppression relative to my personal or family history or habits, past or present, whether believed by me to be material or not, shall immediately, without process, render the certificate issued hereon null and void."

In the application of Theodore McKnelly, in answer to appropriate questions, he stated that he had not consulted a physician during the past ten years and that he had never had consumption.

In the application of Ida P. McKnelly she stated that no member of her household was affected with consumption or had been so affected during the past ten years.

The defendant contends and the court held that it was proven beyond question that Theodore had consumption at the time the application was made and that he had consulted a physician during the preceding ten years, and hence that both certificates were void. The examination of this question necessitates a brief review of the evidence on the subject.

Theodore McKnelly was forty-five years of age, his wife forty-six, and his son (the plaintiff) about twenty at the time of the making of the application, and there was also a daughter, Gretta, about sixteen years of age. The family then lived at Wellington, Kansas. The father was a car inspector and repairer for the Santa Fe railroad and the son had the same employment. Both contributed to the support

of the family.   Theodore was about six feet in height and weighed about 165 pounds.   He went to Albuquerque, New Mexico, for six weeks or so at some time between 1910 and 1912.   While there he worked for the same railroad company.   In the spring of 1912 he quit work or was discharged and did not work for any third person or company thereafter. He had a slight cough,—"he wasn't very well."   He owned some lots in the outskirts of Wellington and put up a tent thereon in the fall of 1912, which was fitted with a floor and board sides, and moved into the tent on the day before the murder with the purpose of living there during the winter. About noon of September 24, 1912, the dead bodies of Theodore, the father, and Gretta, the daughter, were found in the tent, their skulls having been crushed by the blows of a bludgeon.   Ida, the mother, was found lying in a pool of blood, with a bullet wound in her head, from the effects of which she died at 8 :00 p. m. on the same day.

On the subject of the health of Theodore the testimony was briefly as follows: The defendant's medical examiner, one H. F. Hyndman, made a confidential report accompanying the application in which he stated that the applicant had a good figure, step elastic, eyes bright, an appearance denoting a strong, robust physical condition, and made the following answers to specific questions: "14. Did you examine the lungs with the clothing removed from the chest? Yes. a. Are they free from all signs of disease, over every portion clear in murmur, and the percussion note normal? Yes." "27. How do you rate applicant, first class, good, medium, poor, or uninsurable as a risk? First class." The physician further stated that for the good of the order he recommended that the applicant be accepted.   This report was undoubtedly competent evidence as against the company in favor of the plaintiff (McGowan v. Supreme Court I. O. F. 104 Wis. 173, 80 N. W. 603), and constitutes all the affirmative

evidence in the case tending to show that Theodore was not afflicted with tuberculosis at the time of his application. The statements of Theodore himself in the application are not evidence in behalf of the beneficiary. They are self-serving declarations.

The plaintiff *Otto* was strangely ignorant as to his father's physical condition. He protests that he never knew that his father had tuberculosis, but he admits that his father had a little cough as long as he could remember, that during the last summer his father hadn't been exactly well, wasn't able to work for quite a while, and that some said it was tuberculosis.

The testimony on the other side is full, certain, and uncontradicted. Dr. J. D. Ray testified that some time during the latter part of 1909 or the first part of 1910 Theodore came to consult him as a physician on account of a cough which he had and brought some of his sputum which he (the physician) examined microscopically and found tubercular bacilli therein; that he advised the patient that undoubtedly he had tuberculosis and that he ought to go west, to New Mexico; that Theodore told him that a hospital association at Topeka had given him the same advice and that he had come to the physician to have the advice confirmed; that the Santa Fe road had offered him a pass and would see that he got work after he got there. The doctor further testified that Theodore then left Wellington and was gone for a time; that he fixed the date of the examination by the fact that it was shortly before he (the witness) left Wellington and went to live at Fort Madison, Iowa, which was in April, 1910.

Dr. G. D. Pendell testified that Theodore came to his office in the fall of 1911 to consult him; that he, Theodore, was unable to do much work; that he gave him a history of his attacks of coughing, and that from the history of the case and a superficial examination which he gave him, his emaci-

ated look and weak, fast pulse, his judgment was that he (Theodore) was suffering from tuberculosis; also that in his judgment he had been so suffering for several years.

Dr. Mollie E. Howell testified that she had a conversation with Mr. McKnelly about a week before the murder and he said to her, "I know I am a goner; I am a hopeless consumptive," and that his physical appearance was very bad.

Dr. William W. Gill, a physician of long experience, testified as an expert to the effect that if a microscopical examination of the sputum discloses tubercular germs their continuance in the system is certain, and further that the presence of these germs in the sputum in 1909 or 1910 was entirely consistent with the statement of the examining physician, Dr. Hyndman; that taking all the facts certified to by Hyndman the physical conditions disclosed in that certificate could well prevail and the individual still be suffering from tuberculosis; that, without warning of possible tuberculosis by family history or illness of the person examined, an examining physician not making a test of sputum would be warranted in assuming from the examination made in the present case that the individual was in good health.

This is all of the testimony on the subject of the condition of Theodore's health, and we think it justifies the conclusion of the trial judge.

There was absolutely no evidence in the case to cast the slightest doubt upon the credibility, learning, or fairness of Drs. Ray, Pendell, and Gill. Ray and Pendell testified to facts concerning which they had certain knowledge and in which they had not the slightest personal interest. To meet this there is nothing but the general statement of the examining physician, not subject to cross-examination, which may all be true and yet the tubercular condition be present as testified to by Drs. Ray and Pendell. The statement is in effect mere negative evidence of fairly persuasive collateral facts which, in the absence of any other evidence, would sustain an infer-

ence that tuberculosis did not exist, but in the presence of unimpeached and certain affirmative evidence that it was in fact found to exist is not sufficient to sustain a verdict, because it does not necessarily contradict such affirmative evidence. *Ives v. Wis. Cent. R. Co.* 128 Wis. 357, 107 N. W. 452.

So far as the statement made by Theodore in his application, to the effect that he had not consulted a physician in ten years, is concerned, there is absolutely no evidence to controvert the testimony of Dr. Ray, before referred to; therefore this statement is conclusively shown to be untrue.

The results flowing from these considerations are not doubtful.

The statements concerning the health of Theodore contained in the applications were expressly made warranties by the contracts of insurance, and if untrue avoided those contracts unless that result is obviated by some statutory provision. *Baumgart v. Modern Woodmen,* 85 Wis. 546, 55 N. W. 713; *McGowan v. Supreme Court I. O. F.* 107 Wis. 462, 83 N. W. 775; *Hoover v. Royal Neighbors,* 65 Kan. 616, 70 Pac. 595; 1 May, Ins. § 156.

It is said that this principle has been changed by ch. 507, Laws of 1911 (now sec. 4202s, Stats. 1913), which provides that where a medical examiner for an insurance company or association declares an applicant a fit subject for insurance the company shall be estopped from alleging as a defense in an action on the policy that the applicant was not in the required state of health when the policy was issued, except in case of fraud or deceit on the part of the insured. There are two answers at least to this claim: (1) the contract had been made and the rights of the parties fixed before the law was passed, and (2) the contract was not a Wisconsin contract when made and hence is not affected by Wisconsin law so far as contract rights are concerned. It is further claimed, however, that secs. 4200 and 4201, Gen. Stats. Kansas, 1909,

apply to these contracts. These sections constituted secs. 1 and 2 of ch. 226 of the Laws of 1907, entitled "An act in relation to life insurance, and in relation to misrepresentations made in obtaining or securing a policy of insurance, and the effect of such misrepresentations upon such policy." Sec. 4200 provides in substance that no misrepresentation made in obtaining a policy of life insurance shall be material or render the policy void unless the matter misrepresented shall have actually contributed to the contingency on which the policy becomes due and payable. Sec. 4201 provides in substance that in suits on life insurance policies no defense based on misrepresentation in obtaining them shall be valid unless the defendant deposit the premiums in court for the benefit of the plaintiff.

It seems to us very apparent that these statutes apply only to life insurance companies and not to fraternal benefit associations. The statutes of Kansas like those of most other states draw very clear distinctions between the two classes of companies and subject them to very different laws. The laws governing fraternal beneficiary societies are found in the Kansas General Statutes of 1909 beginning with sec. 4303 and ending with sec. 4318, and form art. 11 of ch. 55, being the general chapter on insurance. The sections in question, however, are found in art. 4 of the chapter entitled "Relating to Life Insurance Companies." The word "policy" is exclusively used in the last named article and the word "certificate" in the first named.

The provisions governing fraternal beneficiary societies (now art. 11 above named) were first passed as ch. 23, Laws of 1898, and contained the following provision, which still exists as a part of sec. 4303: "Such association shall be governed by this act, and shall be exempt from the provisions of other insurance laws of this state, and no law hereafter passed shall apply to them unless they be expressly designated therein." Now, while one legislature cannot control its successors as to the manner in which they shall legislate,

this provision is nevertheless very significant as an indication of legislative policy, and its continued existence unrepealed is fairly persuasive proof that the policy there expressed has been and still is adhered to. Taken in connection with the clear indications on the face of the sections themselves, we are convinced that they were not intended to apply and do not apply to certificates issued by fraternal beneficiary societies.

This is the conclusion reached in construing very similar statutory provisions in Missouri. *McDermott v. Modern Woodmen*, 97 Mo. App. 636, 71 S. W. 833.

*By the Court.*—Judgment affirmed.

MARSHALL and BARNES, JJ., dissent.