DELVAUX, Appellant, vs. KEWAUNEE, GREEN BAY & WESTERN RAILWAY COMPANY, Respondent.

*April 3—July 8, 1918.*

*Railroads: Injury to boy on track: Cause of accident: Contributory negligence: Questions for jury: Changing answers in special verdict: Appeal: Reversal.*

1. In an action against a railway company to recover for loss of services of plaintiff's son, caused by injuries, notwithstanding testimony that at the time of the accident the boy had climbed upon a moving car, it is *held* that there was credible evidence sufficient to sustain findings by the jury to the effect that he was run over while crossing the track between the forward cars of a freight train and a rear-end section which, having been uncoupled while the train was still moving, continued in motion; that the proximate cause of the injuries was defendant's negligence in failing to give warning to the boy of the approach of the rear-end section; and that there was no contributory negligence on the boy's part.

2. Although on appeal great weight is to be given to a decision of the trial court changing answers in a special verdict, yet where the verdict as rendered is supported by credible evidence such changes are unwarranted and a judgment based on them must be reversed.

APPEAL from a judgment of the circuit court for Brown county: W. B. QUINLAN, Judge. *Reversed.*

The appeal is from a judgment changing the answers of a special verdict and granting judgment for defendant.

This action is brought by the plaintiff to recover for his expenses and the loss of services arising from an injury to his son Ernest in being run over by a freight car of defendant on its tracks in the city of Green Bay, Wisconsin, May 5, 1914. Another action was started on behalf of the son to recover for his injury arising from the same accident and was tried in November, 1914, before the Hon. HENRY GRAASS, circuit judge, who set aside a special verdict upon which judgment might consistently have been rendered in

favor of the plaintiff in that action, and judgment for the defendant was entered. On appeal to this court, and by a divided court, such judgment was affirmed, 161 Wis. 554, 154 N. W. 380.

On the trial of this case in May, 1916, by a special verdict the jury found as follows:

(1) Defendant's brakeman uncoupled the rear-end section of the train while the train was still in motion;

(2) That after such uncoupling the rear-end section continued in motion;

(3) That Ernest Delvaux was run over and injured by the rear-end section;

(4) That the defendant company failed to exercise ordinary care in that it did not give a warning to the boy of the approach of the rear-end section;

(5) That such failure was the proximate cause of the injuries;

(6) That no want of ordinary care on the part of Ernest proximately contributed to his injuries;

(7) That $2,500 would reasonably compensate the plaintiff herein for his loss.

On appropriate motions the trial court, after a full discussion of the testimony in the case, held that there was contributory negligence by the boy, and that the evidence to sustain plaintiff's theory as to defendant's negligence is so incredible and unreliable and so opposed to the physical facts established by uncontradicted evidence in the case that the verdict cannot stand; and thereupon directed that the answers to each of the respective questions other than the last in the special verdict should be reversed and the assessment of damages should be stricken out, and that upon the verdict so changed the defendant should have judgment. From the judgment thus entered the plaintiff has appealed to this court.

*M. E. Davis* of Green Bay, for the appellant.

For the respondent there was a brief by *Greene, Fairchild, North, Parker & McGillan* of Green Bay, and oral argument by *H. O. Fairchild.*

The following opinion was filed April 30, 1918:

ESCHWEILER, J.    The plaintiff contends that under the evidence in this case the following are the facts:

That Ernest, the injured boy, then about nine years and three months old, with his brother George, about a year and seven months older, and a boy, Lawrence Van Husen, about nine years old, were playing near a stone pile alongside defendant's tracks throwing stones into a marsh on the other side of the track as a freight train from the west came by them; that a member of the train crew came from the forward end of the train, passed by them as they were at the stone pile, went towards the rear end and separated the two sections, leaving the rear one with about six freight cars and the caboose; that the forward end then pulled out towards the east and the boy Lawrence ran across the track between the two sections, and that Ernest, while watching the forward end of the train pulling away, followed him without noticing that the rear section was still in motion, and as he was between the rails his brother George hollered to him, he hesitated, and was struck and run over by the wheels of the front truck only of the front car of that rear section, and that the rear section then came to a stop; that he crawled out a distance of at least twelve to thirteen feet and lay down between the rails of a track parallel with the one on which he was injured; that there was no one on the front end of the rear section to give any warning of its approach; that the right leg was crushed below the knee, requiring amputation, and that all the toes save the little one on the left foot were so crushed and injured that they also were required to be amputated.    The right foot was not injured.

We find nothing so incredible or impossible in the recital given by these boys as to have justified the court below, had there been no further evidence in the case, in determining as a matter of law either that there was no negligence on the

part of the defendant or that there was contributory negligence on the part of the boy.

Defendant's claim is that as the freight train came in by the stone pile Ernest climbed on one of the moving freight cars and before the sections were separated, and while so riding slipped, bringing his left foot upon the top of the rail, and so received his injuries.

To sustain defendant's version, or at least to contradict plaintiff's version, defendant contends that in addition to the testimony of the boy Lawrence Van Husen as an eye-witness, to the effect that the boy Ernest did climb upon a moving car, there must be considered, under the testimony in this case, to have been established as verities the following:

(1) That portions of the toes of the injured boy were found, within half an hour after the accident, pressed against the edge of the top or ball of the rail and hanging from there down on the inside of the south rail on the curved track; that the first joint of the big toe was intact, a toe nail plainly visible on that joint and on each of the next two toes, indicating, as claimed by defendant, that the boy's foot must have slipped while riding on the car.

(2) That the toes were found three to five feet ahead of the front wheels of the rear section, thereby indicating that the accident must have been caused by some car ahead of such section and therefore not as claimed by plaintiff.

(3) That the accident happened about forty-three feet east of the stone pile and not about opposite it, as claimed by plaintiff.

(4) That the train had not been separated before the boy was injured.

(5) That while the injured boy was being cared for, just after the injury, his brother George, in his presence, stated that the injury occurred by reason of Ernest trying to catch a ride.

It is frankly conceded by defendant's counsel that the

testimony of Lawrence Van Husen is to some extent mistaken. He testified positively that as the train passed the stone pile each of four boys climbed on four several cars as they passed by, the injured boy first, and Lawrence on the last one; that he, Lawrence, rode at least two car lengths east of the stone pile and that Ernest was still on at that time. This would have placed Ernest at least six car lengths east of the stone pile or at least 200 feet east of where the toes were claimed to have been found on the rail, and manifestly irreconcilable on that point with either plaintiff's or defendant's version of the accident.

From his cross-examination on this trial it appears that he testified on the trial of the boy's case that while they were at the stone pile he saw the brakeman go past them on his way to the rear end of the train, thus corroborating the two Delvaux boys on that detail.

As to the first of the alleged verities, viz. the condition and appearance of the toes as found on the track, this condition of the toes as described by the witnesses, showing that the first joint was intact and the skin pressed so tightly on the rail that it apparently kept the blood within the joint, giving it a purplish appearance, may be as well if not better reconciled with plaintiff's version than with defendant's, for several reasons.

If Ernest slipped from a moving car it must have been several car lengths ahead of the sixth car, the one which made the head end of the rear section. Maddy, the rear brakeman, testifies that while the train was in motion he was passing on top of the car from the caboose towards the sixth car, where he expected to make the cut; and when on about the fourth car from the rear end he heard a boy scream; he then proceeded forward, and was just getting down from the sixth car as the train stopped and he saw the boy on the sidetrack at least twelve feet away and just opposite where the cut was made.

Manifestly, then, with the train in motion, the car caus-
ing this injury must necessarily have been passing along to-
wards the east after running over Ernest for the period while
Maddy was walking along the top of the two cars and then
for a sufficient length of time at least to permit the injured
boy to crawl out from that track across the intervening space
to the place where he was found; if it be so, it necessarily
follows that several sets of wheels had passed by the point
where the severed toes were attached, as claimed, to the rails,
and it would be well within the jury's field of reasonable
probability to consider that such other wheels would have
either scraped those toes off from the ball of the rail or
crushed them to pulp, and that if but one set of wheels or
but one wheel had passed over the toes, as claimed by plaint-
iff, they might more reasonably have been expected to be
found in the condition indicated in the testimony.

In this connection it may also be noted that it would be a
fair consideration for the jury, in attempting to reconcile
the many apparently contradictory facts in this case, whether
or not, if the boy had slipped from the cars still in motion,
he would, in his injured condition, have had presence of
mind enough and time enough to crawl out from under the
moving cars and drag the balance of his wounded right leg
across the rail in the brief interval that would have elapsed
between his injury from one set of wheels before the next
set of wheels on that moving train reached him.  The testi-
mony as to the nature of the injuries pretty clearly demon-
strated that there had been no second running over of this
boy by another set of wheels.

Again, if it be correct that the toes were but three to five
feet ahead of the sixth car where it stopped as Maddy got
down, it could not have been the car just ahead of Maddy,
as that car was stopping at the same time, and then Ernest
would necessarily have been under that car, or at least crawl-
ing to the other track, as Maddy was descending.  So that it

would be a legitimate inference from the testimony that several cars at least had passed over the fragments of toes before the train came to a stop, on defendant's theory of the case.

On the second point, of finding the toes three to five feet ahead of the front wheels of the rear section: At the time these toes were picked off the rail by Mr. Smith, superintendent and claim agent of defendant, apparently no suggestion had been made to any one that it would be claimed on behalf of the plaintiff that the injury was caused by the forward truck of the rear section of the train rather than by any other portion of the train. Maddy, the brakeman, the only one who knew all the circumstances in connection with the separating of the train, was not present at the time these toes were so found, nor did he hear of the finding of them until it was testified to in the trial of the first case. No measurements were taken at that time of the position those toes were in with reference to the rear section, and all that was given in that regard was a recollection as to estimates made at the times, and no marks were made on the ground or elsewhere for future identification of the position of the toes and these wheels. Some witnesses recollect that blood stains were plainly visible at this point, others had no recollection thereof; the conductor, Dingman, testified on the first trial that he did not see any blood stains, and on this trial that he did.

It was within the province of the jury to say what weight should be given to the recollection of the witnesses as to the fact of the exact place where these toes were found with the other testimony, including the testimony of the aunt of Ernest that she saw blood on the rail opposite the stone pile the next day. The jury had before them the uncertainty of these same witnesses as to whether blood stains were at the spot where the toes were found, an equally demonstrable fact; they also had before them the testimony of one witness that he saw Mr. Smith carefully blow sand away from these toes before wrapping them up, of other witnesses also there

that they did not see the incident, and may have believed that while some witnesses were certainly wrong in their recollections as to some details they may all have been wrong on a detail which at that time was evidently not considered so important as it has since turned out to be, and the jury in the light of all these circumstances might have believed that there was a mistake as to the exact location with reference to the rear section, without necessarily determining that there was perjury by any, much less all, of such witnesses. The jury are the harmonizers of such conflicts, not the court.

The third point is the so-called physical fact, viz. that the location of the place of the injury was determined by measurement to have been forty-three feet east of the stone pile. But this is not such a physical fact as may be considered of controlling weight in a case of this kind, for the measurement was not taken until some time after the injury, and the point from which the measurement was started towards the stone pile and upon which the value of this evidence must rest was fixed by the recollection of Mr. Smith as to where he found the toes, supported to some extent by the recollection of Mr. Juley as to where he saw the blood spots the morning after the accident between the rails where the boy was picked up.

A certain memorandum appears to have been written as the result of such measurements at about the time they were taken; one copy given to a witness, McNamara, who had been called by Mr. Smith to assist in the measurement, and the other kept by Mr. Smith. Neither of these copies was produced on the trial, and Mr. McNamara on this trial, called as an adverse witness by the plaintiff, admitted that on the trial of the first case he had testified that his recollection was that the measurement from the place where Smith said he had found the toes to the stone pile was thirteen feet instead of forty-three. This would bring it opposite instead of east of the stone pile and corroborates plaintiff's version.

The weight to be given to this testimony as to location may

also have been weakened in the minds of the jury by the conflicting statements made by the brakeman, Maddy, as to where the cut in the train was made; on this trial that it was about forty feet east of the stone pile, and also that he could not then say where except by taking into consideration what somebody had told him, and on a former occasion that it was just about opposite the stone pile or just west or east of it. He also testified that the wounded boy was just opposite where the cut was made. If he was correct in saying that the cut was made just opposite the stone pile, then defendant's witnesses were mistaken in locating the forward end of the rear section forty feet east of the stone pile, or else the rear section did move forward after the cut was made, just as found by the jury. And in considering Maddy's testimony the jury might have considered that the train was an hour late and that Maddy's duty for the day was ended when the cut was made and that he had but six car lengths to go from the caboose, that he left the caboose, as the conductor testified, at a point a mile west of where the cut was to be made, which the jury might have thought gave him time and opportunity to be ahead of the sixth car as the time came for the cut to be made; for if each car was, as testified, thirty-five to forty feet long, he had but to walk 240 feet while the train was going 5,280 feet.

On the fourth point, that the train had not been separated before the accident, considerable stress and importance is laid by defendant's counsel.

It was customary at this place in defendant's yards, with this train, for the engineer, after bringing his train to a stop, to proceed with the forward section after giving what was considered sufficient time for the rear brakeman to make the cut. The cut might be made by pulling the pin and uncoupling the air hose, or it might be made by simply pulling the pin, and, as Maddy says, the air-brake hose was so coupled that it would separate itself on the cars pulling apart. Maddy's testimony is that on getting down from the

sixth car as the train came to a dead stop he turned the angle-cock in the air hose on the rear car of the front section, the effect of which would be to hold the air brakes in the rear section set and beyond the control of the engineer in the engine, so that it would be practically impossible to move the train.     Why time was taken to turn this angle-cock instead of simply pulling the pin, which would have been sufficient to have allowed the operation of moving the forward end of the train to be done as usual and perhaps would have taken no appreciable length of time more than setting the angle-cock, does not appear.     Apparently there was no need of holding the forward end of the train on account of the accident, as the injury had already occurred according to Maddy's testimony, and he does not thereafter appeal for help to or notify of the accident the engineer, fireman, and front brakeman, who were riding in the engine at the time.     The engineer had difficulty in starting the train at that time.     He testified that owing to the curve he had no way of knowing whether he was connected with the whole train or not at the time he started it.     It was not customary to wait for signals from the rear brakeman to the effect that the cut had been made before starting ahead.     He found it was necessary to make three pulls, as they are called, before the train could be started, by backing up slowly to gather slack and then pulling forward with the slack.     His testimony is that one of such operations of so backing down and pulling forward on the slack took ten to twelve seconds, but he does not testify directly as to the length of time that was consumed that particular evening.     The conductor, however, testifies that he was in the caboose at the time the stop was made and there was an interval of at least five minutes before the forward section pulled out.     Under Maddy's testimony there was considerable length of time during which he was looking for assistance for the boy before he came back to the train and pulled the pin, thus making the cut.

Several witnesses testify quite positively that the train was

not separated when they came there and saw the boy lying between the tracks. But all these were circumstances proper for the jury to weigh and consider and we cannot on this record override their determination.

The fifth and last point is that from the testimony of one witness who had not been called on the trial of the first case it appears that he came up to the injured boy as he was lying between the rails on the parallel track, and that then his brother George said that the thing happened through their trying to catch a ride. This was denied by both George and Ernest and was clearly a question of fact for the jury to pass upon, and cannot control.

We feel that we have perhaps dwelt more on the questions of fact here involved than might be necessary for the disposition of this case and much more, certainly, than will be of value in any future case; but in view of the history of this matter and the disposition made upon the same state of facts by two learned trial judges to whose opinions we give great weight and consideration, we have felt it proper to explain thus at length the views we reached upon a consideration of the same evidence.

We are not unmindful of the rule that has been established by this court in disposing of such situation in recognizing the great weight to be accorded to the decision of a trial court (*Kuchler v. Milwaukee,* 165 Wis. 320, 162 N. W. 315), and the further rule that must control both the trial court and this court in the consideration of the weight to be given to the determination of questions of fact by the trial jury in order that the constitutionally protected right of litigants to have issues of fact determined by twelve good men and true from the vicinage may be preserved inviolate and in all its original vigor. *McKnelly v. American Yeomen,* 160 Wis. 514, 152 N. W. 169.

But when, as here, from a consideration of the record before us we feel satisfied that there was credible evidence

upon which the jury could arrive at their verdict, the action of a trial court in disregarding such determination is clearly wrong and must be, as it is here, set aside.

It is urged by defendant that in the event of the verdict of the jury being re-established there should be a new trial for alleged errors in rulings on questions of evidence during the trial. We have considered such contention and the suggested errors and do not find that there was prejudicial error against the defendant in the trial of this lawsuit.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions that the verdict of the jury should be reinstated and judgment should follow thereupon in favor of the plaintiff.

WINSLOW, C. J., and VINJE and ROSENBERRY, JJ., dissent.

A motion for a rehearing was denied, with $25 costs and costs of motion, on July 8, 1918.