Peter GIESE and Sue Giese, individually and as parents of Missy Giese, Plaintiffs and Cross-Appellants,

Missy GIESE, a minor, by her guardian ad litem, Arnold J. Wightman, Plaintiff-Appellant and Cross-Respondent-Petitioner,

v.

MONTGOMERY WARD, INC., a foreign corporation, Defendant and Cross-Respondent,

Michael SHANAHAN, a minor, Bernard Shanahan, individually, and d/b/a Shanahan's Tavern, and Dorothy Shanahan, individually, and d/b/a Shanahan's Tavern, Defendants-Respondents and Cross-Appellants and Cross-Respondents and Cross-Petitioners.

Supreme Court

*No. 81-763. Argued March 2, 1983.—Decided March 29, 1983.*

(Also reported in 331 N.W.2d 585.)

394

For the cross-respondent-petitioner there were briefs by *Joe Thrasher, Katherine Mahan Stewart* and *Cameron, Shervey, Thrasher, Doyle & Pelish, Ltd.*, Rice Lake, and *Fritschler, Pellino, Schrank & Rosen*, Madison, and oral argument by *Joe Thrasher*.

For the cross-respondents and cross-petitioners there was a brief by *Clyde C. Cross* and *Cross, Mercer and Maffei,* Baraboo, and oral argument by *Clyde C. Cross.*

For the plaintiffs and cross-appellants there was a brief and oral argument by *Michael Nowakowski,* Madison.

For the defendant and cross-respondent there was a brief and oral argument by *Frank M. Coyne,* Madison.

BEILFUSS, C. J. This is a review of an unpublished decision of the court of appeals which affirmed in part the judgment of the trial court in a personal injury action.

This action arises out of an accident involving a riding lawn mower. Bernard and Dorothy Shanahan own Shanahan's Tavern near Loganville, Wisconsin. The tavern is located next to the Shanahans' home. On August 7, 1977, Peter and Sue Giese and their daughter, Missy Giese, arrived at the tavern in the early evening. Peter planned to spend the evening at the tavern tending bar while Sue intended to have one drink and then return with Missy to their home in Prairie du Sac. Dorothy and Bernard Shanahan were in the tavern when the Gieses arrived. Missy, then age six, entered the tavern with her parents but shortly thereafter left the tavern without them. There is substantial dispute regarding who accepted responsibility for Missy's supervision when she left the tavern. Her parents testified that Dorothy Shanahan offered to fix supper for Missy and that Dorothy left the tavern with or about the same time as Missy. Dorothy testified that she left the tavern shortly after the Gieses' arrival to go to the house to shower prior to going out for the evening. She testified that she did not offer to fix supper for Missy, but rather asked Sue Giese to keep an eye on the children.

Prior to the Gieses' arrival, Bernard Shanahan directed his son, Michael Shanahan, then age fourteen, to mow the lawn in front of the house. Bernard Shanahan owned a seven-horsepower Montgomery Ward riding lawn mower manufactured in 1973 or 1974. Michael had operated this lawn mower several times prior to the day of the accident. When the Gieses arrived Michael had not yet started to mow the lawn but was filling the mower's gas tank. Peter and Sue Giese testified that they did not see Michael before they entered the tavern and did not know he was mowing the lawn until they were informed of the accident. After they entered the tavern Michael began mowing the lawn in front of the house.

As stated earlier, Missy left the tavern and was playing in the yard in front of the house with the two other Shanahan children, Anna Marie and Kevin. The three children began racing toward the tavern, with Missy out in front, when Kevin saw Michael operating the lawn mower in front of them. Michael had been operating the mower in reverse, with the blade engaged, for a distance of 200 feet. He was looking backwards over his right shoulder while operating the mower in this fashion. Just prior to the accident, after negotiating a turn, he looked forward to check his position. Kevin saw Missy running toward Michael and the lawn mower and yelled "Missy" because he "saw danger." This caused Missy to turn and look over her shoulder at Kevin and caused Michael to turn back in the direction he was mowing. Michael then saw Missy within one foot of him. Missy collided with the left rear of the lawn mower and fell. The mower continued moving backward, riding partially over Missy. Michael attempted to lift the mower off Missy and Kevin ran to the mower and disengaged the blade.

Missy suffered serious injury as a result of the accident, including amputation of her right hand at mid-palm, multiple lacerations to and a fracture of the right

forearm, and severe lacerations to her right thigh requiring two skin grafts resulting in permanent scarring. On May 9, 1978, Missy and her parents brought this action against Montgomery Ward, Inc., alleging strict liability and negligence, and against Michael and his parents alleging negligence. All the defendants cross-complained against each other, and counter-claimed against Missy's parents for contribution.

Trial to a jury was commenced on September 10, 1979, Judge Howard Latton, presiding. Missy presented evidence that the mower was defective and unreasonably dangerous and negligently designed in that the lawn mower could be operated in reverse with the blade engaged, thus being susceptible to "back over" accidents because of the operator's lack of vision and control. She also presented evidence that the mower should have had a guard over the blade underneath the mower, or a "bumper" that stops the blade on contact. Montgomery Ward offered evidence that the guard and bumper were not feasible design alternatives. It also presented evidence that the design was safe because it gave the operator the choice of whether he or she wished to engage the blade while moving backwards, that customers want to be able to mow backwards, and that the law mower met or exceeded applicable standards at the time of manufacture and up to the time of trial. Additional facts will be set forth in the opinion.

The trial court submitted a 17-question special verdict to the jury. The jury answered the strict liability question in the negative, but found that Montgomery Ward was causally negligent in the design or manufacture of the lawn mower. Bernard and Dorothy Shanahan were absolved of negligence as to Bernard's control over Michael, and Dorothy's responsibility for the safety of Missy. The jury found Peter and Sue Giese causally negligent with respect to their daughter's safety. The trial

court directed a verdict that Michael acted as Bernard Shanahan's agent and the jury found that he was also acting as Dorothy's agent. These findings by the jury were unanimous.

In answering the comparison negligence question the jury allocated 52 percent to Montgomery Ward, 10 percent to Michael Shanahan, and 38 percent to Peter and Sue Giese. No negligence was allocated to Missy and her name did not appear in the comparison because she was under seven at the time of the accident.[1] Two jurors, Luprue and Gollmer, dissented to this apportionment. The jury awarded Missy $165,000 with jurors Gollmer and Goodman dissenting. Juror Goodman also dissented from the amount of damages awarded to Missy's parents for future medical expenses and loss of society and companionship.[2]

The trial court found the verdict defective and ordered a new trial. The court found the damages awarded to be reasonable and limited the second trial to liability issues only. The court also stated that it would not resubmit the issues of the negligence of Dorothy Shanahan or agency. A second trial was held in September of 1980. The jury again answered the strict liability question in favor of Montgomery Ward. The jury found that Montgomery Ward was negligent "in the design or warnings relating to the lawn mower in question," but found such negligence not to be causal. The jury again found Michael Shanahan and Peter and Sue Giese causally negligent and absolved Dorothy and Bernard Shanahan of

[1] Sec. 891.44, Stats. 1977–78, provides:

"891.44 **Presumption of lack of contributory negligence for infant minor.** It shall be conclusively presumed that an infant minor who has not reached the age of 7 shall be incapable of being guilty of contributory negligence or of any negligence whatsoever."

[2] The trial court directed a verdict on the amount of past medical expenses.

negligence. Thirty-five percent of the negligence was allocated to Michael Shanahan and 65 percent to Peter and Sue Giese. The trial court entered judgment on the verdict in favor of Missy and against Michael, Dorothy and Bernard Shanahan,[3] with the Shanahans having contribution rights against Peter and Sue Giese.[4]

The court of appeals affirmed the order granting a second trial and affirmed the judgment with the modification that there was no liability on the part of Dorothy Shanahan because the master-servant relationship did not exist between Dorothy and Michael.[5] Missy petitioned this court for review of this decision claiming that it was error to order a second trial and that even if the second trial was appropriate the lower courts erred in failing to find that Montgomery Ward's negligence was a cause of her injuries as a matter of law. Bernard Shanahan cross-petitioned, also contending that the second trial was inappropriate, and further asserted that the lower courts erred in holding him vicariously liable for his son's negligence. We granted these petitions.

The first issue on review is whether the trial court, after the first trial, correctly ordered a new trial. Sec. 805.15, Stats. 1977–78, allows a trial court to order a new trial on the following grounds: (1) errors in the trial; (2) verdict is contrary to law or the weight of evidence; (3) damages are excessive or inadequate; (4) newly discovered evidence; or (5) in the interest of justice. In resolving this issue we must therefore examine

---

[3] The trial court entered judgment against Dorothy and Bernard Shanahan based on the findings in the first trial that Michael acted as his parents' agent.

[4] The trial court subsequently ordered judgment in favor of Missy against her parents whom she had not sued. The court of appeals reversed the judgment to this extent.

[5] The court also modified the judgment to allow Missy Giese interest on the damages established in the first trial from the date of that verdict.

the trial court's grounds for ordering a new trial. If any one ground is sufficient then the order must be affirmed.

Our examination of the trial court's memorandum decision and order leads us to the conclusion that the primary reason the trial court ordered a new trial was because it determined that the jury's verdict was contrary to law because it did not meet the five-sixths requirement. Art. I, sec. 5 of the Wisconsin Constitution provides for the right to a jury trial in all cases at law "[p]rovided, however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five sixths thereof." Pursuant to this provision of the constitution the legislature enacted sec. 805.09(2), Stats., which provides:

"(2) VERDICT. A verdict agreed to by five-sixths of the jurors shall be the verdict of the jury. If more than one question must be answered to arrive at a verdict on the same claim, the same five-sixths of the jurors must agree on all the questions."

It is well established in Wisconsin law that this statute requires not that five-sixths of the jury agree on all questions in the verdict, but rather that this number must agree on all questions necessary to support a judgment on a particular claim. *Scipior v. Shea*, 252 Wis. 185, 190, 31 N.W.2d 199 (1948). Thus a verdict must be reviewed on a claim-by-claim basis rather than as a whole. *Krueger v. Winters*, 37 Wis. 2d 204, 212, 155 N.W.2d 1 (1967) ; *United States F. & G. Co. v. Milwaukee & S. T. Corp.*, 18 Wis. 2d 1, 117 N.W.2d 708 (1962) ; *Augustin v. Milwaukee E. R. & T. Co.*, 259 Wis. 625, 49 N.W.2d 730 (1951). Dissents important to one claim may be immaterial to another when the verdict is reviewed in this fashion. *Scipior*, 252 Wis. at 190.

The lower courts, however, failed to apply this claim-by-claim analysis. Instead they looked at the verdict as a whole in concluding that it violated the five-sixths rule. In analyzing the validity of the verdict in light of the dissents, the trial court stated only:

"All parties agree that a problem exists because the same ten jurors have not agreed on all of the questions in the verdict. . . .

"As to dissenting jurors, the problem arises because on the comparative negligence question there were two dissenting jurors and on the damage question for Missy Giese there were a different two jurors. In other words we have ten jurors on all negligence questions, and we have ten jurors on all damage questions."

The court of appeals affirmed the trial court, holding that the trial court properly ordered a new trial because ten jurors did not agree "on damages as well as liability." Both lower courts failed to analyze the verdict on a claim-by-claim basis and therefore we must do so.

The first claims that we examine are Missy's negligence claims against Montgomery Ward and Michael and Bernard Shanahan. These claims can be analyzed together because they all require that the same ten jurors agree on the same questions in the verdict: negligence, cause and damages.[6] The jury unanimously agreed that Montgomery Ward and Michael Shanahan were causally negligent and ten jurors agreed on the amount of Missy's damages. The percentage of negligence attributed to Montgomery Ward and Michael Shanahan did not affect her right to recover from these two joint tortfeasors. Therefore Missy clearly had ten jurors agreeing on all questions necessary for judgment.

---

[6] Bernard Shanahan is included in this grouping because his liability is based on the validity of Missy's claim against Michael. The additional element needed to support Missy's claim against Bernard Shanahan is vicarious liability which was found to exist as a matter of law by the court.

Montgomery Ward contends, and the lower court apparently believed, that the jury's allocation of negligence was necessary to Missy's claims against the defendants. One of the jurors who dissented to Missy's damages also dissented to the allocation of negligence, along with a third juror. If the allocation of negligence was necessary in order for Missy to obtain a judgment against the defendants, then Missy would not have a valid five-sixths verdict because only nine jurors agreed on causal negligence, damages *and* apportionment.

However, the allocation of negligence was irrelevant to Missy's claims against the defendants because she could not be negligent as a matter of law. Missy, a child under seven at the time of the accident, was not and could not be included in the comparison question.[7] The inclusion of the comparative negligence question in the verdict was not necessary to support a judgment as to Missy's claims. The defendants' liability to Missy was not dependent on the allocation of negligence because there was no issue of contributory negligence on the part of Missy. The apportionment of negligence question was included in the verdict for the purpose of determining the comparative contribution rights of the defendants[8] as established in *Bielski v. Schulze,* 16 Wis. 2d 1, 6, 114 N.W.2d 105 (1962). The comparison did not "apply to or change the plaintiff's right to recover against any defendant tort-feasor the total amount of his damage to which he is entitled." *Id.* Therefore the dissents to the comparison question were immaterial to Missy's claims. We hold that Missy's verdict as to Montgomery Ward and Bernard and Michael Shanahan was valid under the five-sixths rule.

[7] *See* note 1, *supra.*

[8] As will be discussed *infra,* the question was also necessary to determine the liability of the defendants to Peter and Sue Giese.

This holding also requires the conclusion that the verdict met the five-sixths requirement as to the contribution claims of the defendants. A claim for contribution is separate from and independent of the underlying claim, *Johnson v. Heintz,* 73 Wis. 2d 286, 295, 243 N.W.2d 815 (1976), and thus the verdict must be separately examined as to these claims. We must therefore determine what questions were essential to enter judgment on the contribution claim. In order to have a claim for contribution the following elements must be present:

" '1. Both parties must be joint negligent wrongdoers; 2. they must have common liability because of such negligence to the same person; 3. one such party must have borne an unequal proportion of the common burden.' " *Johnson v. Heintz,* 73 Wis. 2d at 295.

The first two elements were met by the valid verdict on Missy's claim. This verdict established the defendants as joint tort-feasors who were liable to Missy for her total damages irrespective of the allocation of negligence in the verdict. The requisite common liability for Missy's damages was established by Missy's verdict and the defendants were jointly and severally liable for the entire amount. *Mulder v. Acme-Cleveland Corp.,* 95 Wis. 2d 173, 178, 290 N.W.2d 276 (1980). Thus the only question necessary for the contribution claims was the allocation of negligence question. The jury's answers to this question established the contribution rights and obligations of the defendants and Peter and Sue Giese based on the proportion of negligence attributed to each. The dissents to the damage question are thus immaterial to the contribution claims because of Missy's right to a full recovery. The issues of causal negligence and the amount of damages were tried in the same lawsuit as the contribution claims for procedural convenience and judicial economy, *Johnson v. Heintz,* 73 Wis. 2d at 295.

Montgomery Ward cannot complain about dissents to a question that could have been answered by a different jury in a separate action. Ten jurors agreed on the allocation of comparative contribution and therefore the verdict was also valid under the five-sixths rule as to the contribution claims of the defendants.

The final claim in the verdict that must be examined is the parents' claim for future medical expenses and loss of Missy's society and companionship due to Missy's injuries. Such a claim is derivative in the sense that it depends on whether Missy's injuries are compensable, *White v. Lunder*, 66 Wis. 2d 563, 574, 225 N.W.2d 442 (1975), but must be proved separately from the underlying claim in that distinct damages must be shown and the parents' negligence in causing the child's injuries may reduce or bar recovery under our comparative negligence statute.[9]

Thus, there must be agreement by at least ten jurors as to both the allocation of negligence and the amount of the *parents'* damages. As stated earlier, two jurors dissented to the comparison of negligence. A third juror dissented from the award of damages to the parents. Therefore, because only nine jurors agreed as to causal negligence, comparison and damages, the verdict is defective as to the parents' claim. However, the parents in their motion after verdict before the trial court, and in oral argument before this court, agreed to waive their right to collect these damages if judgment was entered on the first verdict. Such a waiver is clearly permissible, *Krueger v. Winters*, 37 Wis. 2d at 204.[10] Therefore, be-

[9] Sec. 895.045, Stats.

[10] This waiver does not affect their right to collect past medical expense because the amount of past medical expense was determined by the trial court as a matter of law.

cause the verdict was valid under the five-sixths rule, the plaintiffs have a constitutional right to entry of judgment on this verdict unless the trial court order granting a new trial was supported by another ground independent of the five-sixths rule.

Montgomery Ward contends that the trial court also ordered a new trial on the separate ground that a second trial was required in the interest of justice. The court of appeals agreed, finding that the trial court ordered a new trial in the interest of justice because the evidence did not support the jury's allocation of negligence and the "strong likelihood" that the jury was trying to control the outcome rather than making factual determination based on the evidence. We believe that Montgomery Ward and the court of appeals have misread the trial court's memorandum decision and order.

Following the trial court's discussion of the dissents to the verdict, the court stated:

*"Even without the problem of dissenting jurors, the Court would have to find as a matter of law that the negligence of Michael, the operator of the riding mower, exceeded the negligence of Missy Giese's parents and also exceeded the negligence of Montgomery Ward.* A new trial to determine the amount of negligence attributed to each negligent party is within the contemplation of all or at least most of the parties, and within the motions of some. While the apportionment of negligence is within the province of the jury, and the suggestions of counsel are in no way binding upon the jury and can be considered only to the extent that they are helpful, it is worth noting that counsel for Missy Giese suggested no negligence on the part of the parents, while counsel for the Shanahans suggested 20%. In other words, no one so far as the Court can recall, contended that the Gieses should be held to a degree of negligence at the level the jury found.

*"If the Court were making determination for a new trial solely in the interest of justice, the Court would proceed to set forth in greater detail the reasons for its*

*order.* Such reasons are readily recitable even though the respects of negligence differ for the various parties. The only rationale for the 38% figure selected by the jury is their disagreement with the attempt of Mrs. Giese to establish that Missy was to have supper at the Shanahan residence. Even if the jury accepted the Shanahan version rather than that of Mrs. Giese, which is very likely, and even if they challenged Mrs. Giese's credibility because of this, there would be no basis under the undisputed evidence in this case for allocating an amount of negligence to the parents which in any way was comparable to that of the operator of the riding mower." (Emphasis supplied.)

The order granting a new trial stated in pertinent part:

"(1) That Motion (4) of defendant Montgomery Ward, Inc. to set aside the verdict and grant a new trial *on the grounds that the verdict is contrary to law or to the weight of evidence* is granted insofar as the same relates to the issues of negligence between the parties and a new trial is granted as to all parties on all issues of negligence." (Emphasis supplied.)

The decision and order when read together clearly indicate that the trial court specifically chose not to order a new trial in the interest of justice. Rather they demonstrate that the trial court considered the interest of justice ground but rejected it on the belief that there were other sufficient grounds on which to grant a new trial— the verdict was contrary to law or the weight of the evidence. When a trial court orders a new trial in the interest of justice, as opposed to the other statutory grounds, it is required to state in detail its reasons for doing so. *Krolikowski v. Chicago & N.W. Trans. Co.,* 89 Wis. 2d 573, 579–80, 278 N.W.2d 865 (1979); *Leatherman v. Garza,* 39 Wis. 2d 378, 385–86, 159 N.W.2d 18 (1968). The trial court specifically stated it would not do so.

Thus, we conclude that the second ground the trial court relied on in ordering a new trial was that the verdict was against the weight of the evidence based on its determination that Michael Shanahan's negligence exceeded the negligence of Missy's parents and Montgomery Ward as a matter of law. The court of appeals, believing that the trial court granted a new trial in the interest of justice, applied the standard of review that the trial court's order for a new trial will be sustained absent a clear abuse of discretion. While this is clearly the correct standard to be applied when a trial court orders a new trial in the interest of justice, *Krolikowski*, 89 Wis. 2d at 580, the trial court did not order a new trial on this ground. Rather the standard of review that we must apply when the trial court finds that the jury's findings were incorrect as a matter of law is that the verdict must be approved if there is any credible evidence which supports it:

"The proper test to be applied in determining whether a jury's answer should be changed is 'whether there was *any credible evidence* which supported the jury's answer.' *Home Savings Bank v. Gertenbach* (1955), 270 Wis. 386, 392, 71 N.W.2d 347, 72 N.W.2d 697; *Wintersberger v. Pioneer Iron & Metal Co.* (1959), 6 Wis. 2d 69, 94 N.W. 2d 136.

" 'There is credible evidence which, when reasonably viewed, fairly admits an inference supporting the jury's findings. That being true, neither the trial court nor this court has authority to change the jury's findings. *Auster v. Zaspel,* 270 Wis. 368, 71 N.W.(2d) 417.' *Paul v. Hodd* (1955), 271 Wis. 278, 280, 73 N.W.2d 412.

" 'A trial court is not justified in setting aside a verdict either in whole or in part and directing the judgment if there is credible evidence to support the findings. The crucial question is whether the evidentiary facts are practically without dispute, whether these facts reasonably support the jury's conclusion of ultimate fact drawn

therefrom. *DeKeyser v. Milwaukee Automobile Ins. Co.* (1941), 236 Wis. 419, 424, 295 N.W. 755.
"' . . .'
"While this court has said that it gives great weight to a trial court's decision that a verdict must be changed as a matter of law, *Rogers v. Brown* (1910), 143 Wis. 472, 128 N.W. 64; *Kansas v. Chicago, M. & St. P. Ry.* (1923), 180 Wis. 49, 192 N.W. 383, the action of the trial court will be set aside on appeal if there is credible evidence which supports the verdict. *Delvaux v. Kewaunee, G.B. & W. Ry.* (1918), 167 Wis. 586, 167 N.W. 438." *Leatherman v. Garza,* 39 Wis. 2d at 386–87.

■
The trial court found that the apportionment of negligence was unsupported by the evidence. We begin our review of the evidence with the well-established principle that "[a]pportionment of negligence is a matter peculiarly within the province of the jury." *DeGroff v. Schmude,* 71 Wis. 2d 554, 562, 238 N.W.2d 730 (1976). Further, the trial court and this court can not reject the apportionment merely because we disagree or would have reached a different conclusion. *Id.* at 563.

A careful review of the evidence presented at the first trial leads us to the conclusion that there was credible evidence to support the jury's allocation of negligence. The jury allocated 52 percent to Montgomery Ward, 38 percent to Missy's parents, and 10 percent to Michael. It was the small proportion allocated to the operator of the lawn mower that caused the trial court to conclude that the allocation was unsupported by the evidence. While we are also surprised at the low proportion assigned to Michael, based on the record we cannot say, viewing the evidence in the light most favorable to the verdict, that the jury was wrong as a matter of law.

The evidence shows that Michael was operating the mower as it was designed to be operated: in reverse with the blade engaged. Michael was looking in the direction he was mowing at all times, except for the moment be-

fore the collision occurred when he turned forward to check his position. He testified that he was unaware of Missy's presence until a split-second before the accident. The jury may have concluded, based on the evidence, that in the exercise of reasonable care he should not have known of her presence because Missy was only in the yard a short time before the collision. Thus the jury may have concluded that Michael's negligent conduct was slight when compared with the conduct of Missy's parents who were responsible for Missy's safety, and Montgomery Ward, which manufactured the lawn mower.

The evidence as to the parents was conflicting as to whether they had responsibility for Missy's safety and whether they knew the lawn mower was being operated nearby. Assuming the jury discredited the parents' testimony in favor of Dorothy Shanahan, the jury could have concluded that Sue Giese had agreed to "keep an eye on the children," including Missy, and that nevertheless she allowed Missy to leave the tavern unattended. Michael testified that he saw the Gieses arrive while he was filling the gas tank of the lawn mower, and Bernard Shanahan testified that the noise from the mower was audible in the tavern. Thus the jury may have reasonably concluded that the Gieses allowed Missy to leave the tavern when they knew that a lawn mower was being operated nearby.

There was also substantial evidence presented that Montgomery Ward negligently designed the lawn mower. Two experts testified that the mower's design was dangerous because it allowed, and even encouraged, the rider to operate the mower in reverse with the blade engaged. They testified that this method of operation lessened the rider's visibility and ability to operate the controls thus making the mower susceptible to the type of accident involved here. Evidence was introduced demonstrating that the manufacturer knew of the danger inherent in

allowing the mower to be operated in reverse based on engineering publications warning of the frequency of "back over" accidents and the manufacturer's knowledge of three similar accidents involving the same type of lawn mower. Evidence was further presented that a design prohibiting the blade from engaging while in reverse was functional, technologically feasible and inexpensive. Montgomery Ward's defense to this evidence was essentially that most lawn mowers cut grass while in reverse, that consumers wanted lawn mowers to operate in this fashion, and that its design was safe because it gave the operator the choice of whether he or she wished to engage the blade while in reverse. Montgomery Ward also presented evidence that the mower met or exceeded all applicable standards, but the plaintiffs rebutted this with evidence that these standards did not relate to the design defect at issue here.

Based on all the evidence presented at trial, there was credible evidence supporting the jury's allocation of substantial amounts of negligence to the manufacturer and Missy's parents. As to Montgomery Ward, the jury could properly conclude that the manufacturer, which had knowledge of the danger of "back over" accidents caused by reverse operation of the lawn mower, was more negligent than the fourteen-year-old operator who was using the lawn mower as it was designed to be operated. As to the parents, the jury could properly conclude that Peter and Sue Giese, who were responsible for Missy's safety, knew of the presence of the lawn mower and yet left her unattended, were more negligent than the operator of the lawn mower who was unaware that Missy was nearby. While we would have come to a different conclusion as to the proper allocation, there is credible evidence to support the jury's findings and therefore we can not say the findings must be rejected

as a matter of law. It was therefore error for the trial court to order a new trial on the ground that the jury's findings were not supported by the credible evidence as a matter of law.

Montgomery Ward contends that the trial court also ordered a new trial based on several questions the jury asked during its deliberations. These questions inquired into whether Missy's award would be reduced by attorneys' fees and whether the percentage of negligence allocated to Missy's parents would affect her recovery. The trial court correctly told the jury that it should not be concerned with the answers to these questions. The trial court, in its decision, noted that it "considered" these questions in ordering a new trial believing that ". . . there is a strong likelihood that in the apportionment of negligence the jury was disregarding some of the instructions and attempting to control the outcome. . . ." The court of appeals felt that this was one of the trial court's reasons for ordering a new trial in the interest of justice. We disagree.

As we stated earlier, the trial court's memorandum decision and order clearly indicate that the court did not order a new trial in the interest of justice but rather because the verdict was contrary to law and the evidence. We view the trial court's reference to these questions as support for its holding that the apportionment was improper as a matter of law. We have held that this holding was error because there was credible evidence to support the verdict and therefore the questions asked by the jury do not provide an adequate ground for ordering a new trial.

The final ground on which the trial court based its order granting a new trial was that error occurred in the trial. In motions after verdict, Montgomery Ward asked to be dismissed from the law suit, contending that

the court erred in submitting both strict liability and negligence to the jury, and that it can not be found negligent for designing and manufacturing a product the jury found not to be defective. The trial court refused to dismiss Montgomery Ward from the action but held that it was error to submit both theories, stating:

"It seems to be generally conceded that the burden in establishing a strict liability case is less than the burden in establishing negligence. If this is the case, it seems inconsistent to submit the negligence questions after the strict liability questions in the verdict. The Wisconsin Supreme Court has indicated that there are some cases where the trial court should not submit both strict liability and negligence. I am inclined to conclude that this is one of those cases, and that the double submission was very probably confusing to the jury."

The court therefore concluded that a new trial should be ordered so that the negligence issues could be redetermined.

The court of appeals rejected this as a valid ground for ordering a new trial, stating that "[a] product may create a risk of foreseeable harm, and therefore have been negligently designed, without being unreasonably dangerous for purposes of strict liability." We agree.

This court has on several occasions specifically rejected the contention that a jury's finding of causal negligence but no strict liability in tort, as adopted in *Dippel v. Sciano,* 37 Wis. 2d 443, 155 N.W.2d 55 (1967), is inconsistent. *Fischer v. Cleveland Punch & Shear Works Co.,* 91 Wis. 2d 85, 98–99, 280 N.W.2d 280 (1979) ; *Howes v. Deere & Co.,* 71 Wis. 2d 268, 273, 238 N.W.2d 76 (1976) ; *Greiten v. La Dow,* 70 Wis. 2d 589, 603–04, 235 N.W.2d 677 (1975).

Dual submission of these theories is appropriate when evidence is presented to the trier of fact as to both

theories. *Howes,* 71 Wis. 2d at 273. The jury's answers to the strict liability questions are completely independent of and irrelevant to its answer to the negligence questions. The record contains evidence that the lawn mower was in a defective condition unreasonably dangerous to users and bystanders, and that Montgomery Ward was negligent in manufacturing and designing the product. Therefore the submission of the two theories was not error and the jurors' negative answers to strict liability in tort questions did not render its affirmative answers to the negligence questions invalid.

Because we conclude that the trial court had insufficient grounds to overturn the jury's verdict in the first trial, we hold that the order granting a new trial must be reversed. We therefore do not reach the issue raised by the parties regarding the second trial. The only issue remaining on review as to the first trial and verdict is whether the trial court was correct in holding Bernard Shanahan vicariously liable for his son's negligence.

The trial court directed a verdict in the first trial concluding, as a matter of law, that Michael was acting as the "agent" of Bernard Shanahan and thus Bernard was vicariously liable for Michael's negligence.[11] The court of appeals affirmed, finding that Michael was Bernard's servant. Bernard Shanahan contends that the issue of whether a master-servant relationship existed between him and his son was not raised by the pleadings and that as a matter of law such relationship did not exist.

The issue of the existence of a master-servant relationship was clearly not raised in the first trial. Rather, the plaintiffs, Montgomery Ward and the trial court

---

[11] The jury found that Michael was also the "agent" of Dorothy Shanahan. The court of appeals reversed the judgment entered on this basis against Dorothy, finding that the master-servant relation did not exist between Dorothy and Bernard. This issue has not been raised in this review.

proceeded solely on the basis that Michael was Bernard's "agent." As was thoroughly discussed by this court in *Arsand v. City of Franklin*, 83 Wis. 2d 40, 264 N.W.2d 579 (1978), the distinction between being an "agent" and a "servant" is crucial to the determination of whether a principal is vicariously liable. An agent may or may not be a servant and, except under certain obligations, the principal is not vicariously liable for the negligent physical conduct of an agent who is not a servant. *Id.* at 48. However, "[u]nder the doctrine of *respondeat superior*, a master can be held liable for the physical harm caused to third persons by the torts of his servant." *Id.* at 45. Thus in order for Bernard to be liable for Michael's negligence the master-servant relationship must exist. Although not raised in the trial court, the issue was addressed by the court of appeals and raised by the parties before this court and we will consider the issue on review in the exercise of our discretion.[12]

A "servant," as defined by this court, is "one employed to perform service for another in his affairs and who, with respect to his *physical conduct* in the performance of the service, is subject to the other's control or right to control." *Arsand,* 83 Wis. 2d at 45–46, quoting *Heims v. Hanke,* 5 Wis. 2d 465, 468, 93 N.W.2d 455 (1958). The facts pertinent to the issue of whether Michael was Bernard's servant are undisputed. At the time of the accident Michael was operating the lawn mower that was owned by Bernard and he was performing this task at his father's express direction. The accident occurred while Michael was mowing the lawn in front of the house, which was located next to the tavern. The tavern

[12] We have chosen to exercise this discretion because, although the terms "agent" and "servant" are distinct concepts in law with different legal consequences, they are often *incorrectly* used synonymously and interchangeably. *Arsand,* 83 Wis. 2d at 55–57.

and the home were jointly owned by Bernard and Dorothy Shanahan.

Bernard Shanahan argues that his son's actions in mowing the lawn pursuant to his direction were not for his benefit and that this court should hold that a minor child who is performing a domestic chore can not be the parent's servant. The court of appeals correctly and succinctly rejected this argument, stating:

"The domestic relationship does not preclude a finding of liability, however. If a master-servant relationship exists, it is immaterial that the act was performed by a child rather than a stranger. *Zeidler*, 191 Wis. at 383, 211 N.W. at 142.

"To act as master, the parent must obtain some benefit or advantage from an activity undertaken by the child at the request or expressed desire of the parent. *Burant*, 234 Wis. at 388, 291 N.W. at 391. It is irrelevant that the benefit to the parent results from the child's performing a domestic chore. *Compare Heims v. Hanke*, 5 Wis. 2d 465, 83 N.W.2d 455 (1958) (trial court could conclude uncle was liable as master for negligence of his unpaid minor nephew who was helping wash the uncle's automobile). Although cases have said that to impose liability upon the parent, the child must be acting in the parent's 'business,' *Papke v. Haerle*, 189 Wis. 156, 158, 207 N.W. 261, 262 (1926); *Hopkins v. Droppers*, 184 Wis. 400, 404, 198 N.W. 738, 739 (1924), the business need not be an undertaking for profit but embraces 'any benefit which may inure' to the parent. *Zeidler*, 191 Wis. at 383, 211 N.W. at 142. The definition of master adopted by *Arsand, supra,* imposes no requirement that the servant be engaged in a money-making business for the master."

Under the undisputed facts and the law as correctly stated by the court of appeals, Michael was acting as Bernard's servant at the time of the accident. This finding does not rest on the domestic relationship between

Bernard and Michael, or the fact that the activity can be labeled a "domestic chore." The finding of a master-servant relationship rests on the fact that Bernard directed Michael to perform the task, he had the right to control Michael's performance of the task and, Bernard, as owner of the home and tavern, benefited from its performance. We therefore affirm the finding of the trial court and the court of appeals that Bernard Shanahan was vicariously liable for his son's negligence in operating the lawn mower thereby causing injury to Missy.

We conclude that the judgment entered on the second verdict should be reversed and direct that judgment be entered on the first verdict in favor of Missy and against Montgomery Ward and Michael and Bernard Shanahan. Judgment should also be entered, based on the first verdict, in favor of Peter and Sue Giese on their claim for past medical expenses against Montgomery Ward. Such judgment shall include interest to Missy Giese on the damage award in the first verdict from the date of that verdict as directed by the court of appeals. The judgment should also be entered fixing the amount of contribution between the various contribution claimants.

*By the Court.*—The decision of the court of appeals is reversed with directions to enter judgment not inconsistent with this opinion.