**Laurie DELVAUX, Plaintiff-Appellant,**

v.

**FORD MOTOR COMPANY,
Defendant-Appellee.**

No. 84–1841.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1985.

Decided June 12, 1985.

See also, D.C., 518 F.Supp. 1249.

Robert E. Sutton, Sutton & Kelly, Milwaukee, Wis., for plaintiff-appellant.

Paul E. Schwemer, Merten & Schwemer, Milwaukee, Wis., for defendant-appellee.

Before CUDAHY and ESCHBACH, Circuit Judges, and BROWN, Senior District Judge.*

CUDAHY, Circuit Judge.

Laurie Delvaux brought this action against Ford Motor Company for negligence in the design of a Mustang convertible, and under a theory of strict liability for the unreasonable dangerousness of the design. She appeals from jury verdicts for Ford. We affirm.

## I.

Appellant Laurie Delvaux was a passenger in a 1968 Ford Mustang convertible when it overturned at a road construction site in Green Bay, Wisconsin on May 21,

* Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1977. As a result of the accident, Delvaux is paraplegic. Delvaux commenced this product liability action against Ford Motor Company in the United States District Court for the Eastern District of Wisconsin on May 14, 1980. She alleged that the convertible was defective and unreasonably dangerous, and that it was negligently designed in not being provided with a roll bar.

The case went to trial on March 22, 1984; on March 31, 1984, the jury returned a special verdict finding that Ford was not negligent and that the Mustang was not "in such defective condition as to be unreasonably dangerous."

## II.

The first issue raised by the appellant is whether the trial court erred in not allowing appellant's counsel to interrogate jurors about improper contacts by defendant-appellee's representatives. Delvaux alleges that the wife of one of the jurors, a Mrs. Seivert, was present during the trial, and that Mrs. Seivert engaged in conversation with the wife of an investigator for the defendant. Delvaux also alleges that during closing argument Mrs. Seivert reacted loudly and inappropriately to argument of counsel for the defendant. Finally, Delvaux alleges that immediately after closing argument and instructions, and before the recess after which the jury was to commence its deliberations, Mrs. Seivert was observed speaking "furtively" with one of the defendant's attorneys. After trial, Delvaux's counsel requested permission to speak with the jury to determine whether extraneous information was improperly brought to the jury's attention, or whether any outside influence was brought to bear. *See* FED.R.EVID. 606(b). Delvaux argues that it was error for the court to deny this request.

Delvaux's counsel first brought the conversation between Mrs. Seivert and Ford's counsel to the court's attention before the jury began its deliberations. The court then gave counsel three choices: the first was to call in the juror whose wife was involved and question him about the allegations to determine if he should be replaced by one of the alternatives; the second was to allow the jury to continue as originally selected; and the third was to submit the case to all eight jurors, the six regular and the two alternate. Counsel for the parties agreed to the last of these, and the matter was submitted to an eight person jury. Counsel for Delvaux gave as his reason for not wanting to question the juror at that time that such a procedure would create a risk of upsetting and prejudicing the juror against the defendant.

After trial, plaintiff was free to interview jurors in an attempt to secure affidavits that would support a new trial. In March 1984 the verdict was returned; in April 1984 plaintiff filed a motion for a new trial; in May 1984 she filed her notice of appeal. On June 7, 1984, Local Rule 8.06 of the Eastern District of Wisconsin, prohibiting communication with jurors except by leave of the court, went into effect. On June 20, 1984, plaintiff made her first request to interview jurors, a request which the court denied. Citing the requirement of good cause under Rule 8.06, the district court found that Delvaux had not made a sufficient showing of cause to justify examination of the juror.[1]

Whether to allow the jury to be questioned after trial is within the discretion of the trial judge. *Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 514 (2d Cir.1981), *cert. denied*, 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982). Considerations of some weight favor allowing such question-

---

1. Rule 8.06 of the Local Rules for the Eastern District of Wisconsin provides as follows:

   No attorneys appearing in this court, or any of their agents or employees, shall approach, interview, or communicate with any member of the jury except on leave of court granted upon notice of opposing counsel and upon good cause shown. This rule applies to any communication before trial with members of the venire from which the jury will be selected, as well as any communication with members of the jury during trial, deliberations, and after return of a verdict. Any juror contact permitted by the court shall be subject to the control of the Judge.

ing when appropriate. *See, e.g., Budoff v. Holiday Inns, Inc.,* 732 F.2d 1523, 1525–27 (6th Cir.1984) (mere suggestion that contact was improper may warrant a new trial). But because equally imposing considerations weigh against jury examination after trial, *see, e.g., Miller v. United States,* 403 F.2d 77 (2d Cir.1968),[2] we will not lightly overturn a decision not to allow such questioning.

In this case, it is clear that the district judge did not abuse his discretion in denying plaintiff the right to question the juror. For all the plaintiff has shown, the wife of a juror apparently had casual conversation with the wife of an investigator for the defendant, and with counsel for both sides.[3] No direct contact with a *juror* has been shown. While *any* contact, even with relatives of jurors, is cause for suspicion, the seriousness of suspicion raised must be weighed against the disruption caused by the questioning in determining the appropriate response. Here, although the judge did not offer to simply disqualify Mr. Seivert, as plaintiff requested, he did offer to allow plaintiff to question Mr. Seivert before deliberations began. And when plaintiff refused, for tactical reasons, the judge allowed the two alternates to take part in the deliberation as a way of offsetting any possible outside influence. Both parties agreed to this change (although plaintiff did not thereby give up her objection to the judge's failure to disqualify Mr. Seivert).

While we concede that plaintiff is entitled to decline, for tactical reasons, to interrogate the juror, such calculations involve a risk; one risks losing the jury's good will by questioning the juror; but one risks losing the chance to interrogate him if one chooses to keep the good will of the jury. While plaintiff has not given up her right to object, we think that there would have at least to be some direct evidence of outside influence on the jury itself to warrant allowing such questioning after trial, since plaintiff gambled on not questioning him during trial, when the effect of any possible influence could have been minimized.

2. To determine how far such questioning shall be permitted and in what manner it shall be done requires a weighing of two conflicting desiderata. One is the protection of a defendant's right to a fair trial before "an impartial jury." The other is avoidance of the dangers presented by inquiries that go beyond objective facts: inhibition of jury-room deliberations, harassment of jurors, and increased incidence of jury tampering.
403 F.2d at 82.

3. The most crucial conversation—one that plaintiff alleges involved the amount of a settlement with other defendants—took place just before the dinner break before the jury began its deliberations. The most damaging scenario would be the following: Mrs. Seivert inquired of defense counsel the amount of the settlement with the other defendants; during dinner Mr. Seivert managed to slip out of the marshall's view to make a phone call (or managed to convince the marshall to allow him to make a phone call); he called his wife and got the information from her, and it entered into his calculations and perhaps the calculations of others in reaching the verdict. While that scenario is not impossible, in the circumstances it seems more than a little unlikely. We quote from the appellant's brief:

> While leaving the courtroom counsel for the plaintiff overheard Mr. Merten, the attorney who had made the closing argument on be-

half of the defendant, conversing with Mrs. Seivert in a familiar and secretive manner and overheard some of the subject matter of the conversation to involve the amount of the settlement that the plaintiff had received in the actions in the State Circuit Court cases. When Mrs. Seivert and counsel for the defendant observed that they were being overheard, their reaction was to rapidly separate and attempt to give an impression of non-recognition. Mrs. Seivert rapidly left the building and in a surprising departure from her habit on the prior days of trial did not return for the deliberations. It was apparent to counsel for the plaintiff that Mr. Seivert, when he sat in the jury box after the verdict was returned, was searching through the courtroom, with his eyes, attempting to find his wife. Her absence was extremely unusual.

If in fact her absence was in some way connected with a deliberate attempt to get information, then had there been some sort of communication between Mr. Seivert and his wife, it is implausible that she would not have told him of her intention to stay away from the courtroom. If, on the other hand, her absence had nothing to do with what went on earlier in the courtroom, much of the suspiciousness built into the plaintiff's description of events is dissipated.

Some significant justification would be necessary for us to permit two bites at this particular apple, and such justification is missing here. *Cf. Garcia v. Murphy Pac. Marine Salvaging Co.*, 476 F.2d 303 (5th Cir.1973) (similar rationale for not allowing party with knowledge of misconduct to withhold objection until *after* verdict).

Finally, nothing prevented plaintiff from interviewing Mr. Seivert after trial; there was at that time no rule requiring court supervision of such an interview. Not only did plaintiff not take advantage of the opportunity, but we can rule out the possibility that plaintiff simply deferred the interview until too late. In April, when moving for a new trial, plaintiff filed with the district court a certificate which confirmed that she had no intention of filing any additional affidavits relating to the motion. Since the question of jury tampering is not relevant to the merits of Delvaux's case, but only to the question of whether she deserves a new trial, and since the one appropriate way to get juror testimony on the issue of tampering before the court on a motion for a new trial is in the form of an affidavit, Delvaux had every reason, if she thought an interview with a jury would be helpful, to secure that interview before her April 10 motion. The trial court, which had offered to allow interrogation of the juror before the jury began to deliberate, still had nothing but "pure conjecture" to work with on this issue by the time it denied the motion for a new trial on April 27. Delvaux can hardly have been said to have diligently pursued this issue, and it was within the discretion of the trial court to put an end to the matter.

Under these circumstances, the decision of the district judge to prohibit Delvaux from communicating with the jurors about the trial was appropriate.

### III.

This suit was brought under theories of negligent design and strict product liability for design defect. The jury found that the convertible Laurie Delvaux was riding in was neither unreasonably dangerous nor negligently designed. Plaintiff Delvaux argues that she was entitled to a directed verdict on the question of negligence; she claims that Ford never tested the convertible Mustang with the top down in rollover crashes, and that such a failure to test is negligent as a matter of law. Ford, on the other hand, claims that *it* was entitled to directed verdicts on the questions of negligence and strict liability.

In Wisconsin, the standard for a directed verdict is this: taking that view of the evidence which is most favorable to the party against whom the verdict was sought to be directed, if there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury. *Samson v. Riesing*, 62 Wis.2d 698, 215 N.W.2d 662, 666 (1974). Further, a jury's verdict will not be upset on appeal if there is any credible evidence to support it. *Thompson v. Village of Hales Corners*, 115 Wis.2d 289, 340 N.W.2d 704, 716 (1983). We find that Delvaux was not entitled to a directed verdict; that Ford was entitled to a directed verdict on the question of strict liability; and that although Ford was *not* entitled to a directed verdict on the question of negligence, the jury verdict of no negligence should stand.

### A.

In *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967), the Wisconsin Supreme Court introduced a theory of strict product liability. It adopted the formulation of the Restatement Second of Torts, § 402A, which sets out a two part inquiry for liability:[4] there must be a defect, and the prod-

**4.** § 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
  (a) the seller is engaged in the business of selling such a product, and

uct must, because of the defect, be unreasonably dangerous.

There are a number of ways of interpreting the requirement of a "defect" in design cases. One way would simply weigh the danger of the actual design against the benefits; Prosser and Keeton call this the "danger/utility" approach. PROSSER & KEETON, TORTS, 699–700 (1984). Another would have the court take the view of the ordinary consumer: assuming that the ordinary consumer [or user] is the best judge of whether the dangers he perceives are outweighed by the benefits of the product, it would assess liability only where the actual danger exceeds those perceived by the ordinary consumer. Prosser and Keeton call this the "consumer-contemplation" (or "user-contemplation") approach. *Id.* at 698–99.

Although the consumer-contemplation approach reintroduces the discredited "open and obvious" rule, now rejected by most jurisdictions, it is the rule accepted in Wisconsin. *See Sumnicht v. Toyota Motor Sales,* 121 Wis.2d 338, 360 N.W.2d 2, 15 (1984). It is true that the rule was questioned in *Gracyalny v. Westinghouse Elec. Corp.,* 723 F.2d 1311, 1320 (7th Cir.1983); but it has been asserted in a number of recent cases, and we have no reason to doubt that the proposition in *Sumnicht* expresses the law for Wisconsin. *See Priske v. General Motors Corp.,* 89 Wis.2d 642, 279 N.W.2d 227, 235 (1979).

■ Under this rule, the convertible design of the Mustang is unreasonably dangerous only if it presents dangers not apparent to the ordinary consumer or user. While with most products this is an appropriate question to send to the jury, we believe that, in the case of convertibles, it is so clear that dangers apparent to the ordinary consumer and user include the danger of accidents like the one involved here, that the trial court ought to have directed a verdict for the defendant.

■ The question in the case of strict liability, after all, is not one of alternative design, but whether the *actual* design is unreasonably dangerous. *D.L. by Friederichs v. Huebner,* 110 Wis.2d 581, 329 N.W.2d 890, 903 (1983).[5] Under the consumer-contemplation approach it is very nearly a tautology that dangers which are obvious to the ordinary consumer or user of a product cannot outweigh the benefits of the product. Thus the obvious dangers of a convertible as *actually designed,* and independently of any possible alternative designs or safety features, do not suffice to make it unreasonably dangerous.

■ Since the most obvious feature of a convertible is its lack of a roof, dangers which the ordinary consumer would associate with that feature will not support a strict product liability cause of action in Wisconsin. Among those dangers is the danger that, should the car be in a rollover accident, injuries of the sort involved here will occur.

■ We hold that, as a matter of law, a convertible automobile is not unreasonably dangerous because of its convertible design.

### B.

■ Moreover, the duty of a manufacturer of products with a special design is only to consider alternatives compatible with the special design. *Curtis v. General*

---

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

   (a) the seller has exercised all possible care in the preparation and sale of his product, and

   (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.

5. *Cf. Roach v. Kononen,* 269 Or. 457, 525 P.2d 125, 129 (1974) ("[I]t is generally recognized that the basic difference between negligence on the one hand and strict liability for a design defect on the other, is that in strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did.").

*Motors Corp.*, 649 F.2d 808, 811–12 (10th Cir.1981). A manufacturer is not negligent for not providing his convertibles with steel roofs, because a convertible is designed as a roofless car. Plaintiff here suggests that a roll bar is a feasible alternative for a convertible.

■ Defendant's brief takes the position that the manufacturer is not required to consider the roll bar alternative. That position is appropriate for strict liability, but it is not appropriate when determining negligence unless the addition of a roll bar would destroy the convertible feature. Since we cannot say as a matter of law that that is so, and since we cannot say as a matter of law that the addition of the roll bar would not have made the convertible safer to a degree that would have warranted its cost, we think that it was proper to send that question to the jury. But we also find that the jury verdict of no negligence was not without support in the evidence, and should not be overturned.

We need not consider the possible effects of adding a roll bar, for plaintiff has presented only one reason, on this appeal, for thinking that the design was in fact negligent: she argues that Ford had a duty to test the convertible in rollover accidents without the roll bar, and that since it did not do so, the design was negligent.

■ Testing, of course, is often a duty; a manufacturer cannot escape liability by simply claiming not to know of various dangers. He is charged with a knowledge he would have had, had he made the effort to acquire it. Thus he cannot argue that he didn't know of a certain danger when he would have known of it if he had performed reasonable tests.

But given that rationale, it is apparent that there is no duty to test where a danger is obvious enough so that a manufacturer could not plausibly plead to being unaware of it. We are not certain what plaintiff believes could have been learned in tests such as those she proposes here; certainly it doesn't take much more than an experiment in imagination to see that a rollover accident in a convertible may end in the kind of tragedy that is involved in this case. For the same reason we don't believe that the designer of an airplane is negligent in designing it if he fails to test to determine what would happen should the plane fly into the side of a mountain.

For all that the plaintiff has argued, therefore, there is no reason to question the jury verdict of no negligence.

## IV.

Finally, the plaintiff raises a number of points which are irrelevant in light of the holding we have reached. Plaintiff argues that it was error to include on the verdict form room for the assessment of the comparative fault of non-parties.. She reasons that since this is a second collision suit, the other parties—the driver, for example—could not have contributed, and their inclusion on the form only distracted the jury from Ford's contribution. The short answer to that is that since the jury found that Ford's percentage of liability was zero, the design being neither negligent nor unreasonably dangerous, the presence or absence of other parties on the verdict form was immaterial to the outcome.

■ The plaintiff also complains of the admission of certain hearsay evidence. Since that evidence concerns the behavior of the driver and the location of the plaintiff in the car at the time of the accident, and thus goes at most to the connection between the alleged negligence or defect and the injury, a finding of no negligence and no defect means that the effect of the testimony was harmless.[6]

---

6. The trial court had allowed a police officer to testify to statements made soon after the accident by the driver and another passenger. The statements concerned, among other things, the location of the plaintiff in the car. The trial court admitted this evidence under the "public record" exception of the hearsay rule, FED.R. EVID. 803(8), and under the general exception for statements having requisite guarantees of trustworthiness, FED.R.EVID. 803(24).

Rule 103 of the Federal Rules of Evidence provides that "error may not be predicated upon

The plaintiff complains, too, that certain other evidence was *not* admitted, namely the evidence of a rehabilitation expert. But since his testimony was relevant of the issue of damages only, and since no damages were awarded, the exclusion of his testimony was not reversible error.

The last issue plaintiff raises concerns the jury. The jury deliberated from 10:00 P.M. until 1:00 A.M. on the final evening of the trial, and plaintiff argues that the verdict was the product of exhaustion, and of being "pushed" to bring a complicated case to a close.

In fact the trial court gave the jurors the option of waiting until the next day; and the judge made clear that even if deliberations had begun, they could be suspended overnight. The jury began to deliberate, then sent the court a note indicating that they would see where deliberations led. Plaintiff did not object to the lateness of the hour, and apparently the jury was able to reach a decision in something over two hours without any "pushing" or prodding by the trial judge. Decisions of this sort are entrusted to the discretion of the trial judge. *United States v. Marques,* 600 F.2d 742, 747 (9th Cir.), *cert. denied,* 444 U.S. 858, 100 S.Ct. 119, 62 L.Ed.2d 77 (1979).

For these reasons, the judgment of the trial court is affirmed.

---

a ruling which admits or excludes evidence unless a substantial right of the party is affected." The evidence would be relevant, of course, to the question whether any negligence on the part of Ford was the cause of the injury. Since the jury found neither negligence nor defect, however, and since the jury in addition allocated negligence among the parties and found that of the various parties Ford bore no part of the liability, the question of Delvaux's location in the car is irrelevant to the outcome of the case, and the evidence does not affect a substantial right of any party.

In any case, the evidence would evidently have been admissible, if not under the rationale adopted by the trial court, under other exceptions to the hearsay rule. For example, Ford could have offered the testimony at trial to impeach the testimony of the passenger, who denied having said anything to the officer about Delvaux's position in the car, under Rule 801. See Trial Transcript, p. 456.