Jamie **KOMANEKIN, a minor by his Guardian ad Litem, Charles J. HAUSMANN; Theresa Komanekin, his mother; and State of Wisconsin, Department of Health and Social Services, Plaintiffs,**

v.

**INLAND TRUCK PARTS, Dana Corporation, Blackmer Pump, Buyers Products Company, Roscommon Manufacturing Company, and John Does A through Z, Defendants.**

Civ. A. No. 92–C–0212.

United States District Court,
E.D. Wisconsin.

April 26, 1993.

Margan R. Kmiec, Kmiec Law Offices, Robert L. Elliott, Charles Hausmann, Hausmann–McNally, s.c., Milwaukee, WI, for plaintiffs.

Ralph J. Tease, Jr., Liebmann, Conway, Olejniczak & Jerry, Green Bay, WI, for defendant Roscommon Mfg.

Douglas J. Klingberg, Robert Bull, Ruder, Ware & Michler, Wausau, WI, for defendants Dana Corp. and Inland Truck.

Peter J. Hickey, Everson, Whitney, Everson & Brehm, Green Bay, WI for defendant Blackmer Pump.

Michael R. McCanna, Appleton, WI, for defendant Buyers Products.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

Plaintiff Jamie Komanekin was seriously injured when, at age five, he became entangled in an auxiliary drive-shaft underneath a truck delivering propane gas to his parents' home. In an amended complaint, filed August 31, 1992, Jamie claims that defendants, the makers and suppliers of the drive-shaft components and related equipment, are liable for his injuries because they failed to provide the manufacturer of the truck with a guard for the drive-shaft or because they failed to warn the manufacturer that a guard was necessary.

On January 29, 1993, defendants Blackmer Pump ("Blackmer"), Inland Truck Parts ("Inland"), Dana Corporation ("Dana"), Buyers Products Company ("Buyers Products"), and Roscommon Manufacturing Company ("Roscommon") filed separate motions for summary judgment. During an April 2 pretrial conference, the court denied the motions, and it now sets forth the reasons for that decision.

Jurisdiction in this court is based upon 28 U.S.C. § 1332.

## FACTS

### I. The Accident and the Machinery Involved

On November 2, 1988, a propane delivery truck owned by the Menominee Gas Company ("Menominee Gas") pulled into the driveway at the Komanekin home on the Menominee Indian Tribal Reservation. Jamie, then five years old, went out to greet the driver of the truck, Daniel Peters ("Peters"), as the truck, its engine running, pumped gas into the Komanekin tank. After speaking briefly with Jamie, Peters climbed into the cab of the truck to complete some paperwork, losing sight of the boy. Jamie's mother, plaintiff Theresa Komanekin, was inside the

house. Hearing a loud noise from the back of the truck, Peters disengaged the truck's pumping system and turned off its engine. Then he walked around the back of the truck and found Jamie standing on the other side of it, his arms missing up to his shoulders.

The truck's pumping system hangs underneath the truck and is powered by the truck's engine. The pump itself, positioned at the rear of the truck, is driven by the rotation of a five-foot auxiliary drive-shaft, the rear end of which is connected to a shaft protruding through either end of the pump. The front end of the drive-shaft is connected to a "power take-off," or "PTO," which harnesses energy from the truck's transmission and exerts a rotational force on the drive-shaft.

The pumping system was assembled and installed on the truck in 1987 by Arrow Tank and Engineering Company ("Arrow"), which sold the truck, also known as a "bobtail," to Menominee Gas on December 11, 1987. The pump was manufactured and supplied to Arrow by Blackmer. The PTO was manufactured by Chelsea, a division of Dana, and supplied to Arrow by Inland. Various parts of the drive-shaft were manufactured by Roscommon and supplied to Arrow by Buyers Products.

Although the precise cause of Jamie's injury is uncertain, it appears that his arms became entangled in the rotating drive-shaft after he snagged his clothing on the head of a "set screw" protruding from the drive-shaft near or at its connection to the pump. Jamie might have been attracted to that area of the pumping system by patterns of light created by the rotation of the drive-shaft. Jamie's injury was not caused by any malfunction in the pumping system; it worked as intended.

The pump, Blackmer model number TLGLF3, was specially designed for use in bobtail delivery trucks such as the one manufactured by Arrow, but was not specially designed for the Arrow truck. (July 11, 1990 Blackmer Answers to Interr., Ex. F at 10; Jan. 27, 1993 Hickey Aff., Ex. B at 166.) In theory, Blackmer says, the pump could have been used in different ways. For example, it could have been "direct[ly] mount[ed]" on a PTO, rather than connected to the PTO

through a drive-shaft. (Jan. 27, 1993 Hickey Aff., Ex. A at 95.) Or, it could have been driven by an entirely different power source, such as a hydraulic system. (*Id.*) Neither alternative, however, was advised in Blackmer's 1969 handbook, which was still in use in 1987, when Arrow built the truck in question. (Sep. 28, 1992 Reihl Dep. at 31.) Rather, the handbook states:

> Pumps on bobtails are usually driven by the power take-off through a jack shaft [i.e., drive-shaft] connected by universal joints. Figure 2 [omitted] illustrates the correct mounting of the drive line when universal joints are used.... [N]ote that the PTO and pump shafts should always be parallel; that the universal yokes at the ends of the jack shaft should be parallel; and the angularity should not exceed 15 degrees.

(July 11, 1990 Blackmer Answers to Interr., Ex. B at 7.)

While Blackmer thus anticipated that the pump would be used in conjunction with a drive-shaft and PTO, it was not actually aware of the size or structure of the chassis upon which the pump would be mounted, nor of the length of the drive-shaft that would be used. (Jan. 29, 1993 Blackmer Statement of Facts at ¶ 16; Mar. 29, 1993 Kmiec Aff. at ¶ 36.) Blackmer was not consulted on the design of the Arrow truck. (Jan. 27, 1993 Hickey Aff., Ex. B at 166.) When sold to Arrow, the pump was accompanied neither by drive-shaft guards nor by warnings concerning the necessity of guarding the drive-shaft. (Jan. 27, 1993 Riehl Aff. at ¶ 7.)

Blackmer did, however, supply a guard to cover a part of the pump itself. As noted above, a pump-shaft extends through each side of the pump and can be connected at either end to a drive-shaft. Thus, one end of the pump-shaft will not be used and will spin freely when the pump is in operation. To prevent exposure to that end of the pump-shaft, Blackmer supplied a guard for it along with a decal warning that the pump should not be operated "without guards in place." (Mar. 29, 1993 Kmiec Aff., Ex. 154.) No such guard or warning, however, was affixed

806

to the end of the pump-shaft that was attached to the drive-shaft.

The drive-shaft consists of about a dozen different parts. (Jan. 26, 1993 McCanna Aff., Ex. 37A.) The shaft itself is made of three tubes, connected by "yokes." The middle tube, narrower than the other two, rests in a "hanger bearing," which holds the drive-shaft to the chassis of the truck. At both ends of the drive-shaft there are two interlocking yokes, one fixed to the shaft and the other fixed to the PTO or the pump. The yokes are connected to one another by a "cross and bearings" and are held in place by set screws, which will protrude from the drive-shaft unless the assembler uses "recessed" set screws. Arrow purchased these drive-shaft components separately and assembled them itself. Often, Arrow would need to cut the drive-shaft tubes to fit varying chassis sizes. (Jan. 3, 1991 Orth Dep. at 165.)

Plaintiffs claim that most or all of the drive-shaft parts were manufactured by Roscommon and sold to Arrow by Buyers Products. (Mar. 4, 1993 Orth Dep. at 40, 50; Jan. 26, 1993 McCanna Aff., Ex. 37A at 2.) Roscommon does not seem to challenge that assertion, but Buyer Products does. (Jan. 29, 1993 Roscommon Findings of Fact at ¶¶ 18, 19.) Based on measurements of the shaft that caused Jamie's injury, Buyers Products concludes it could have sold only about half of the parts of the shaft, including the outer two tubes and the yokes and cross bearings associated with those tubes; it says it could not have sold the middle tube, the hanger bearing, and related parts, because these parts were not listed in the Buyers Products catalog. (Jan. 9, 1993 Schoonover Aff. at ¶¶ 7, 8.) Buyer Products acknowledges, however, that in the year preceding the manufacture of the truck in question, it did sell Arrow a lot of drive-shaft parts. (Jan. 19, 1992 Saltzman Aff., Ex. A.) Arrow manager Graham Orth insists that Arrow purchased drive-shaft parts from no one else. (Mar. 4, 1993 Orth Dep. at 40, 50.)

Neither Roscommon nor Buyer Products advised Arrow on which drive-shaft parts to purchase, and neither company was consulted on the design of the Arrow truck. Both companies assert that the drive-shaft parts purchased by Arrow were adaptable to numerous different applications, while plaintiffs insist that Buyers Products, having dealt with Arrow for many years, knew very well that the parts would be used on a propane delivery truck in connection with a PTO and a pump. Indeed, a Buyers Product official concedes as much. (Mar. 29, 1993 Elliot Aff., Ex C at 19.) No guards or warnings accompanied the drive-shaft parts that Arrow purchased.

As noted above, it was not inevitable that the PTO sold to Arrow, a Chelsea "420 Series," would be connected to a drive-shaft, for the device could have been directly mounted on a pump or whatever other equipment it was intended to power. Indeed, about half of the 420 Series PTOs that Dana sold may have been used in direct-mount applications. (Jan. 28, 1993 Karo Aff., Ex. H at 74.) Nevertheless, from the owners manual and other materials delivered along with Dana's PTO, it appears that use of a drive-shaft was at least anticipated. (Mar. 29, 1993 Kmiec Aff., Exs. 10(b), (c).)

When the PTO is engaged, its gears contact the vehicle's transmission, causing them to spin, and the gears do the same to a stub extending through the side of the PTO, which, again, is attached directly, or indirectly through a drive-shaft, to a pump or other equipment. The materials delivered to Arrow along with the Dana PTO included four warning labels. Two of them concerned proper operation of the PTO and were to be placed, according to Dana's recommendation, inside the cab of the truck. (Mar. 29, 1993 Kmiec Aff., Ex. 10(b).) The other two warnings were to be placed on either side of the frame of the truck "in a position that would be highly visible to anyone that would go under the truck near the P.T.O. rotating shaft." (Id.) The warnings looked like this:

**WARNING**

Rotating shafts can be dangerous. You
can snag clothes, skin, hair, hands, etc.
This can cause·serious injury or death.
To avoid serious injury or death from a
rotating shaft:

1. Do not go under the vehicle when the engine is running.
2. Do not work on a PTO or shaft (with or without a guard) when the engine is running.
3. Do not engage or disengage the PTO or driven equipment by hand from under the vehicle when the engine is running.
Always shut the engine off before working on or near the system.
**DO NOT PAINT OVER THIS LABEL!**

(Mar. 29, 1993 Kmiec Aff., Ex. 10(b).) Arrow correctly affixed the warning labels to the Menominee Gas truck. (*Id.,* Ex. 38.)

The following safety information was offered on page two of the PTO owner's manual, written by Dana:

IMPORTANT:

Because most of our Chelsea Power Take-Offs and P.T.O. drive-lines are sold through distributors, the product applications and the resulting degree of exposure to danger of the operators are beyond the knowledge and control of Chelsea.

Therefore, the proper installation of the P.T.O. and its associated equipment, and the decisions of whether to install guards and/or warning signs shall be the responsibility of the designers or installers.

(Mar. 29 Kmiec Aff., Ex. 10(c).)

Dana's Spicer division, which manufactures agricultural drive-shafts, was less equivocal on the question of guarding. Spicer's 1984 catalog warns that "[d]rive []ines rotating in an exposed area should be shielded to prevent possible accident or serious personal injury." (Mar. 29 Kmiec Aff., Ex. 195.) Most of the drive-shafts listed in the catalog are said to come with plastic or steel shields. (*Id.*)

Arrow had no direct contact with Dana, but may have occasionally obtained advice from Inland on what type of PTO would be appropriate for a given application. (Jan. 29, 1993 Inland Br. at 14, 15; Jan. 28, 1993 Karo Aff., Ex. F at 176.) Inland was generally aware that the PTOs it sold to Arrow would be installed on propane delivery trucks. (Jan. 28, 1993 Karo Aff., Ex. K at 19.) Inland was not consulted, however, on the design of the trucks, and was not familiar with their precise design.

Arrow has been putting together tank trucks for various industries, including the propane gas industry, since 1957. (Jan. 3, 1991 Orth Dep. at 93.) Arrow not only installs the PTOs, drive-shaft components, and pumps described above, but also resells them; resale of such parts accounts for about ten percent of the business of Arrow's truck tank division. (*Id.* at 34.) According to Orth, Arrow chose not to guard the drive-shaft on the Menominee Gas truck because it concluded that the shaft was relatively inaccessible, given its location underneath the

truck, and Arrow still feels that the shaft was adequately "guarded by location." (*Id.* at 133.) That view is shared, Orth says, by the entire tank truck industry in the United States; the industry practice is not to install guards for auxiliary drive-shafts. (*Id.* at 136.)

## II. Procedural History and Jurisdiction

Each of the defendants in this action, as well as Arrow and Menominee Gas, originally was sued in the Menominee Indiana Tribal Court in an action filed January 24, 1989. There, plaintiffs settled with Arrow and Menominee Gas, leaving only the instant defendants, who objected to the tribal court's exercise of jurisdiction. Rather than await resolution of the jurisdictional issue, the parties stipulated that the tribal court action would be dismissed and that defendants would submit to jurisdiction in this court. (Apr. 15, 1993 Hausmann Aff., Ex. 1.) The stipulation was entered September 12, 1991.

Jurisdiction here is based upon 28 U.S.C. § 1332. Plaintiffs are Wisconsin citizens, as well as members of the Menominee Indiana Tribe. Inland is a Minnesota corporation with its principal place of business in Minnesota. Dana is an Ohio corporation with its principal place of business in Ohio. Blackmer is a Michigan corporation with its principal place of business in Michigan. Buyers Products is an Ohio corporation with its principal place of business in Ohio. Roscommon is a Michigan corporation with its principal place of business in Michigan. There is an amount in controversy in excess of $50,000.

## ANALYSIS

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The court must draw all reasonable inferences from the record in favor of the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989).

■ Plaintiffs charge the defendants with strict liability for the sale of defectively designed products and with liability for negligence in the design of such products. The difference between these theories is not obvious. Strict liability arises when a product is sold "in a defective condition unreasonably dangerous to the user or consumer." *Shawver v. Roberts Corp.*, 90 Wis.2d 672, 681, 280 N.W.2d 226 (1979). Negligence-based liability arises when the seller of a product breaches the duty of reasonable care in designing or manufacturing the product. Under either theory, the plaintiff must show that the product was "unreasonably dangerous." *Greiten v. LaDow*, 70 Wis.2d 589, 596, 235 N.W.2d 677 (1975). But that term has different meanings under each theory. *Giese v. Montgomery Ward, Inc.*, 111 Wis.2d 392, 413, 331 N.W.2d 585 (1983).

■ Under Wisconsin's strict liability theory, unreasonable danger is seen from the consumer's perspective alone. The question is not whether the seller could have done a better job of designing the product, but whether the actual design of the product "presents dangers not apparent to the ordinary consumer or user." *Delvaux v. Ford Motor Co.*, 764 F.2d 469, 474 (7th Cir.1985); *Vincer v. Esther Williams All–Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 331, 230 N.W.2d 794 (1975) (citing Restatement 2nd of Torts § 402A, cmt. i.) Put differently, characteristics of a product that are "open and obvious" to the ordinary consumer or user do not render the product unreasonably dangerous in strict liability. *Delvaux*, 764 F.2d at 474. In the negligence context, by contrast, the reasonableness of a product's design turns essentially on whether the seller could have come up with a less dangerous design. *Id.* at 474–75.

■ Thus, if an injury was caused by an open and obvious danger in the product's design, but the seller should have known of a feasible design adjustment that would have

eliminated the danger, a negligence claim might lie even though a strict liability claim would not. Conversely, if injury was caused by a latent design defect, unknown to both the consumer and the seller, a strict liability claim might lie even though a negligence claim would not. *See, e.g., Flaminio v. Honda Motor Co.,* 733 F.2d 463, 467 (7th Cir. 1984). It is therefore necessary to consider separately each type of claim.

■ Finally, before turning to plaintiffs' specific claims, it is worth noting that "bystanders" such as Jamie, as well as "users" and "consumers," are protected by the doctrine of strict liability. *Howes v. Hansen,* 56 Wis.2d 247, 201 N.W.2d 825 (1972). In a bystander case, presumably, a product is unreasonably dangerous if it presents dangers not apparent to the ordinary bystander. *Id.,* 56 Wis.2d at 259, 201 N.W.2d 825. Thus, a product not unreasonably dangerous to the ordinary user or consumer might well be unreasonably dangerous to the ordinary bystander.

### I. Dana and Inland

#### A. *Strict Liability*

The danger of Dana's PTO was its tendency to cause a drive-train or other attachment to rotate rapidly and possibly entangle things dangling nearby. Perhaps the ordinary bystander would appreciate that danger in general terms, but there is a genuine issue of fact as to whether the full extent of the danger would have been appreciated. Dana's decals state that rotating shafts "can snag clothes, skin, hair, hands, etc.," and that "this can cause serious injury or death." Even assuming the ordinary bystander would have observed the warning, it is still possible that he or she would not be aware of the proximity of the drive-shaft to the edge of the truck, or of the ease with which the drive-shaft can grab whatever comes near it.

■ Dana and Inland contend, however, that they cannot be held liable for injury caused by the PTO after it was connected to the drive-shaft and installed on the truck. When a component is incorporated into a larger product, contributing to the dangerousness of the product, the seller of the component is liable for injury caused by that danger unless the component was made dangerous through "further processing or substantial change." *Shawver,* 90 Wis.2d at 685, 280 N.W.2d 226. In *Shawver,* the court held that the application of a control system to a conveyor constituted further processing of the conveyor, such that a jury reasonably found the conveyor's manufacturer not liable for injuries arising out of use of the conveyor but attributable to a defect in the design of the control system. *Id.* at 685, 280 N.W.2d 226. The system was defective because it failed to alert the user before causing the conveyor to move. *Id.* at 684, 280 N.W.2d 226.

■ *Shawver* cannot mean that the liability of a component part seller is extinguished as soon as the part is attached to something larger, for the decision affirms a rule to the contrary. 90 Wis.2d at 685, 280 N.W.2d 672. Rather, *Shawver* seems to draw a line between components that directly contribute to the dangerousness of the whole product and components that become dangerous only as a result of their incorporation into the whole. In this case, Dana's PTO falls into the former category. Its dangerousness was due not only to its placement in the Arrow pumping system but also to its own internal design, which enabled the user to transfer the force of the truck's transmission onto the driveshaft. Whether that quality of the PTO was unreasonably dangerous in the strict liability sense is a question for the trier of fact.

#### B. *Negligence.*

■ Plaintiffs claim that Dana and Inland acted negligently either in failing to supply a drive-shaft guard along with the PTO or in failing to warn Arrow that such a guard was necessary. Both companies insist they could not have guarded the drive-shaft, for even if they anticipated that a drive-shaft might be used, they could not have predicted its length or any of the other specifications necessary to proper construction of a guard. The court concludes, however, that the questions of how much these companies knew about the precise application of their PTO, and of how much they needed to know in order to make

an appropriate guard, must be answered by the trier of fact.

■ A duty to warn arises if the seller of a product has reason to know that the product is likely to be dangerous for its intended use and that the user would be unaware of the danger. *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1317 n. 11 (7th Cir. 1983). That means "there is no duty to warn members of a trade or profession about dangers generally known to that trade or profession." *Shawver*, 90 Wis.2d at 686, 280 N.W.2d 672. From the existing record, however, it is unclear whether Arrow and the rest of the tank truck industry fully understood the extent of the danger created by an unguarded PTO, particularly with respect to trucks used in residential areas. Thus, the court cannot conclude that there was no duty to warn.

■ Note that Inland's status as a retailer does not insulate it from the duty to warn, as long as it was, or should have been, aware of the extent of the PTO's dangerous propensities. *Strahlendorf v. Walgreen Co.*, 16 Wis.2d 421, 432, 114 N.W.2d 823 (1962).

■ Dana did provide a warning, of course, but its adequacy is open to debate. Warnings must be given with "a degree of intensity ... commensurate with the potential danger." *Schuh v. Fox River Tractor Co.*, 63 Wis.2d 728, 739, 218 N.W.2d 279 (1974). It is possible that the potential danger of connecting a PTO to a drive-shaft was so great as to require that the user be informed of the absolute need to guard the drive-shaft, not merely of the need to stay away. *See Schuh*, 63 Wis.2d at 738–39, 218 N.W.2d 279. That, again, is a decision to be made by the trier of fact.

## II. Roscommon and Buyers Products

### A. *Strict Liability*

Plaintiffs claim the drive-shaft was unreasonably dangerous not in some particular part of it, but as a whole. Thus, plaintiffs must show that Roscommon or Buyers Products supplied enough of the drive-shaft to be responsible for the drive-shaft as a whole. Presumably, such responsibility would arise not upon selling, say, an isolated nut, but only upon selling a substantial portion of the drive-shaft. The mere fact that the drive-shaft was supplied unassembled, however, does not relieve its suppliers of liability. *See Flaminio*, 733 F.2d at 465.

Again, in view of *Shawver*, it is necessary to consider whether the drive-shaft actually contributed to its own dangerousness or whether, instead, it became dangerous only as a result of its placement in the Arrow pumping system. The court concludes that the former is true. Although the drive-shaft only caused injury after the PTO made it spin, the drive-shaft itself certainly facilitated that danger, for it was designed to spin at an extremely rapid rate. By contrast, the dangerousness of the conveyor in *Shawver* was deemed to arise not from any unreasonably dangerous propensity in the conveyor itself, but solely from its attachment to an inadequate control system. 90 Wis.2d at 684, 280 N.W.2d 226.

■ The drive-shaft was not merely put into the pumping system, however, but may have been cut or otherwise "tailored" to fit the system. The question is whether such tailoring constituted "substantial change" sufficient to relieve Buyers Products and Roscommon of strict liability. *See Shawver*, 90 Wis.2d at 685, 280 N.W.2d 226. There is no sensible reason to relieve a component seller of strict liability for its product's dangerousness unless the component was changed in a way that substantially increased, or changed the nature of, its dangerousness. In this case, the ordinary alterations made to the drive-shaft do not appear to have had that effect; they merely made the thing a bit smaller. Thus, the court concludes that the drive-shaft was not subject to substantial change.

### B. *Negligence*

■ Buyers Products and Roscommon are charged with having breached their duty to guard the drive-shaft or to warn Arrow of the need for a guard. Both companies claim that designing a guard for the drive-shaft was not feasible, given the variety of applications to which it could be put. The court concludes, however, that there is a genuine

issue of fact on that question. First, it is possible that Buyers Products did know with a sufficient degree of certainty how Arrow would use the drive-shaft components. Second, it is possible that a guard of general application, or of multiple applications, could have been designed, eliminating the supplier's need to know exactly how the drive-shaft would be used. The existing record does not foreclose either possibility.

As for failure to warn, the same standards discussed above with respect to Inland and Dana, and essentially the same conclusions, apply here.

### III. Blackmer

#### A. *Strict Liability*

██ The Blackmer pump did not cause or otherwise contribute to the chief danger of the drive-shaft, its rapid rotation. Still, Jamie may have been caught on a protrusion from the drive-shaft at its connection to the pump, and Blackmer may have been in some way responsible for that protrusion being there. Thus, is it fair to say that Blackmer's pump may have contributed to the overall danger of the drive-shaft. And, as noted above, there is a genuine issue of fact as to whether the ordinary bystander would appreciate the full extent of that danger.

#### B. *Negligence*

██ Blackmer, like the other defendants, is charged with having breached its duty to guard the drive-shaft or to warn the manufacturer of the need to guard the drive-shaft. The court concludes that Blackmer's responsibility for guarding the drive-shaft extends, if at all, only to that portion of the drive-shaft that involves its connection to the pump. With respect to the duty to warn, there are genuine issues of fact as to whether Arrow was fully aware of the danger created by the pump's connection to the drive-shaft and as to the adequacy of the warning that Blackmer supplied.

### IV. Effect of the Settlement with Arrow

Each defendant contends it was effectively released from strict liability as a result of the Pierringer release contained in plaintiffs' settlement agreement with Arrow. In *St. Clare*

*Hosp v. Schmidt, Garden, Erickson, Inc.,* 148 Wis.2d 750, 437 N.W.2d 228 (Ct.App.1989), the court held that a settlement agreement between the plaintiff and one of three defendants extinguished all strict liability in the case, because that defendant was the only party subject to strict liability in the first place, aside from an insolvent company that had not been joined. In this case, by contrast, there remain a number of solvent and potentially strictly liable defendants, so plaintiffs' settlement agreement cannot be construed as extinguishing all claims for strict liability.

By distinguishing this case from *St. Clare*, the court does not wish to give added authority to that decision, the logic of which is not terribly compelling. In effect, *St. Clare* gives an otherwise strictly liable party the benefit of a settlement between the plaintiff and another party, simply because of the first party's insolvency. While that may an appropriate consideration in a bankruptcy proceeding, it has, as far as this court is aware, no other bearing on the question of a person's liability for causing personal injury.

**IT IS THEREFORE ORDERED** that the January 29, 1993 motions for summary judgment filed by Inland Truck Parts, Dana Corporation, Blackmer Pump, Buyers Products Company, and Roscommon Manufacturing Company are DENIED.